John J. Kelly, J.
In two of three consolidated proceedings, the petitioners, trustees under two indentures of inter vivos trusts, seek judicial settlement of their accounts and construction of certain provisions of the trusts. Specifically, as holders of shares of stock of a regulated investment company (sometimes called a “ mutual fund ”), they seek instructions whether, within the purview of the provisions of the trusts, capital gains distributions made by the company are income distributable to the income beneficiaries of the trusts or are principal allocable to the corpora of the trusts. They also request instructions concerning the allocation of estate taxes and attorneys’ fees among the persons interested in one of the trusts. In the third proceeding the executors of the will of the settlor of the trusts request instructions concerning the allocation of estate taxes and attorneys’ fees insofar as they are referable to one of the trusts and other property. The parties have stipulated, with the approval of the court, that examination and settlement of the ¡trustees ’ accounts shall be deferred pending determination by the court of the issues on which instructions are sought.
*674 There shall be considered first the treatment of capital gains distributions, as between principal and income, paid to the trustees on the shares of stock of the regulated investment company.
Aldo B. Balsam (hereinafter referred to as the “ settlor ”) died on March 19, 1963. Prior to his death he had created various trusts. We are concerned at this point with two of them. They are described in the petitions as the “ 1931 trust ” and the ‘ ‘ 1935 trust ’ ’, representing respectively the years of their creation. In fact, the 1931 trust originally consisted óf two separate indentures of trust executed in May and October, 1931, which were later merged and consolidated. The settlor transferred to the trustee of the May, 1931 trust certain parcels of real property and to the trustee of the October, 1931 trust certain shares of stock. The net value of the real property alone was in excess of one million dollars. Both instruments provided that the trustee shall pay the net income of the trusts to Diogenes M. Balsam (Diogenes), father of the settlor, during his life; upon his death the principal of the trusts shall revert to the settlor; the settlor with the consent of Diogenes shall have the right to modify, alter or amend the trusts; and the settlor and Diogenes shall have the unlimited powers in directing the trustee’s investment policies of the trusts. During the years from 1931 to 1935 the settlor and his father had been experiencing difficulties and delays in the management of the trusts, particularly in dealing with persons and corporations interested in the sale, mortgaging and leasing of real properties owned by the trusts which were situated in various States and localities. Also, in 1935, Diogenes proposed to make a contribution to the May, 1931 trust in consideration for the settlor’s agreement to amend the May and October, 1931 trusts in such a way that the issue of Diogenes, which included the settlor and his sister, Mrs. Morton, and their respective issue, would be entitled to all the income and remainder interests in the trusts after Diogenes’ death. It is evident that in 1935 the settlor decided to eliminate the difficulties encountered in the administration of the trusts and accept his father’s proposal. To that end, in July, 1935, with the consent of his father and the trustee, he caused the incorporation of Pine Holding Corporation (hereinafter referred to as “Pine”) pursuant to the laws of the State of Delaware, with a charter, not limited by any of the provisions of the trusts, which granted broad powers to purchase, sell, mortgage, lease, and otherwise deal in real and personal property. In November, 1935, in performance of his agreement with his father, he (1) executed an *675 instrument merging and consolidating the May and October, 1931 trusts, (2) after the merger, amended the 1931 trust to provide that the income therefrom be paid to Diogenes for life and upon his death 50% of the corpus be allocated for the benefit of the settlor’s children and their issue together with Mrs. Morton and her issue, and that the balance of the corpus revert to the settlor in fee; and, (3) created the 1935 trust to which he transferred to designated trustees all of his reversionary interest in the 1931 trust, and provided that upon the reversion the income therefrom be paid to himself for life and upon his death the corpus be allocated according to the provisions of a formula designated in the trust. Between July, 1935 and the amendment of the 1931 trust and creation of the 1935 trust, the corpus of the October, 1931 trust was transferred to Pine in exchange for its stock. From December, 1935 and extending through 1936, the real property which had constituted the corpus of the May, 1931 trust was conveyed to Pine in exchange for additional shares of its stock.
Suffice it to say at this point that those interested in both trusts are two of the settlor’s children, Richard A. Balsam, born in 1924, Maria Balsam Milone, born in 1934, and the settlor’s niece, Marian Morton Brown, born in 1927, all of whom are the income beneficiaries. Their children, all of whom are infants, are the remaindermen.
Both trusts provide that during the settlor’s life he have unlimited power in directing the trustees ’ investment policies of the trusts, subject only to the condition that he execute and deliver to the trustees written consents relating to trust investments. They also provided that the settlor had reserved the power to modify, alter or amend the trusts except that he might “ not amend the terms and dispositions of the corp(ora) or principal and income or accumulated income of the trust estate(s) adversely to the interests of any person beneficially interested therein without the consent of such person ”. Other pertinent provisions of the trusts shall be referred to hereafter. Also, in November, 1935, after amending the 1931 trust and creating the 1935 trust, the settlor executed instruments relinquishing all powers which had been reserved to him under both trusts to alter, modify or amend any provisions of the trusts.
Diogenes died in 1940. Thereupon there was transferred to the reversionary 1935 trust one half of the corpus of the 1931 trust including 247 shares of the stock of Pine. The other one half, including a like number of shares of Pine’s stock, was retained in the 1931 trust as required by its provisions. Mrs. Morton died in 1953. Thereupon, the 1931 trust, as to one *676 quarter of its corpus, terminated, and that share, including 61.75 shares of Pine’s stock, was distributed to the trustee of a trust created by Marian Morton Brown, Mrs. Morton’s only child. The trustee of that trust continued to hold those shares until the time of the settlor’s death.
In 1958 the settlor suffered a heart attack. As a result he became uneasy about the financial prospects of the trusts in the event that he would no longer be available for the guidance of Pine, the stock of which was the principal asset of the trusts. After consultation with the officers of Pine and its attorney, he devised a plan which contemplated that all of the assets of Pine would be exchanged in a tax-free transaction for the stock of a mutual fund company, followed by a tax-free liquidation of Pine. As part of this plan it was necessary for Pine to divest itself of all its real estate holdings, it having been made known to the settlor that mutual fund companies would consider an exchange of their shares of stock only if the assets of Pine consisted of marketable securities and cash. Pine embarked on a program of such divestiture and by December 27, 1961 had sold all but one of its parcels of real estate. Despite the fact that this one parcel remained unsold, the settlor entered into negotiations with various mutual fund companies to arrange the exchange of Pine’s assets for their stock and the completion of the settlor’s over-all plan. On March 17, 1963 negotiations with Broad Street Investing Corporation (Broad Street) culminated in an oral agreement between the settlor, on behalf of Pine, and the officers of Broad Street which provided for such exchange upon the disposition of the last remaining parcel of real estate and the execution of formal documents to be drafted by the parties’ respective attorneys. A contract for the sale of the last remaining parcel of real property was executed on the afternoon of March 19, 1963 and the settlor died that evening. A deed conveying that property was executed and delivered to the purchaser on April 11, 1963. After the settlor’s death, Pine’s net assets were in excess of four million dollars invested in marketable securities, in large part acquired with the proceeds realized from the sale of Pine’s real property after 1958. The trustees and the officers and directors of Pine were of the opinion that the oral agreement entered into between Broad Street and the settlor, on behalf of Pine, should be concluded. Accordingly, on August 12, 1963, Pine and Broad Street entered into a written agreement providing for the exchange of Pine’s assets for Broad Street’s stock. However, the agreement provided that its consummation was conditioned upon obtaining a judgment author *677 izing the transaction. In a proceeding instituted by the trustees in the Supreme Court, New York County (Index No. 13678/ 1963) a judgment was entered on March 24, 1964 which authorized the consummation of the transaction. Thereafter, on May 15,1964, in a tax-free transaction, all of the assets of Pine were exchanged for shares of Broad Street stock. Pine was subsequently liquidated in a tax-free dissolution. At the time of the institution of these proceedings the trustees held 81,247 shares of Broad Street stock in the corpus of the 1931 trust and 120,000 shares in the corpus of the 1935 trust.
Broad Street has qualified as an open-end regulated investment company, having registered under the provisions of the Investment Company Act of 1940, as amended (U. S. Code, tit. 15, § 80a-l et seq.). Each of its investors own a prorata share of the securities held in its portfolio. Its earnings are acquired from dividends and interest paid on securities in its portfolio which are classified as ordinary income, and also from the net profits realized on the sale or exchange of its investments which are designated as capital gains. As required by the Investment Company Act (supra) its statements to its shareholders and the public specifically characterize the source of the earnings. It is not disputed that ordinary income is properly treated as income distributable to the income beneficiaries. The issue arises as to the allocation of the capital gains distributions. The petitions of the trustees allege that each year Broad Street pays capital gains dividends which are payable at the election of the owner of such shares in cash or in additional shares of the corporation’s stock. They are uncertain as to whether such capital gains dividends are income and distributable to the income beneficiaries of the trusts or are principal to be retained by the petitioners in the corpora of the trusts. The income beneficiaries maintain that they should be treated as income and distributed to them. The guardian ad litem appointed to represent the infant remaindermen on this issue contends that they are principal and should be added to the corpora of the trusts. Initially, consideration must be given to the trust instruments to determine whether the settlor’s intention concerning the distribution can be ascertained therefrom. If it can, it would be controlling.
The paramount rule in the construction of inter vivos trust indentures is to ascertain the settlor’s intention as expressed in the instruments in the light of the circumstances surrounding and attending their execution, and when ascertained to effectuate that intention unless contrary to public policy or an established rule of law. (Matter of Fields, 302 N. Y. 262; Matter of Cowles,
*678 22 A D 2d 365, affd. 17 N Y 2d 567; Matter of Day, 10 A D 2d 220.) Other than those heretofore related, the record is devoid of any extrinsic circumstances existing at the time of the execution of the instruments which would shed light on the settlor’s intentions concerning the allocation, as between principal and income, of the capital gains dividends with which we are here concerned. There is no evidence that, at the time of the amendment of the 1931 trust in 1935 and the creation of the 1935 trust, the settlor was familiar with the operation of regulated investment companies or the nature of their dividend distributions. As a medium of investment those companies grew in popularity as a result of the enactment of the Investment Company Act of 1940 and the tax advantages accruing to the companies and shareholders under subchapter M of the Internal Revenue Code of 1954 (U. S. Code, tit. 26, §§ 851-855) where the company submits to Federal regulation thereunder. (Cf. 3 Bogert, Trusts and Trustees [2d ed.], p. 249, n. 8.) It was not until the settlor decided in 1958 to exchange Pine’s assets for the shares of an investment company that the evidence discloses the settlor’s awareness of their form of distribution of income and capital gains dividends. Looking to the trust indentures, the only reference to the treatment to be accorded to corporate dividends is found in the provisions that 11 Any and all dividends payable in the stock of the corporation or association declaring or authorizing the same, and declared and authorized in respect of any stock constituting in whole or in part the principal of the trust fund, as well as all rights to subscribe for new or additional stock, shall be wholly principal and not income of the trust.” However, those provisions do not contain any express direction concerning the allocation of dividends payable at the election of the trustees in cash or in additional shares of Broad Street. It is so conceded by the guardian. (Cf. Kellogg v. Kellogg, 166 Misc. 791, affd. 254 App. Div. 812; Matter of Hurd, 203 Misc. 966; Matter of Appleby, 15 Misc 2d 200.) Nor -may the distribution by Broad Street, be considered as a right to subscribe for new or additional shares of stock. Implicit in the term “ rights to subscribe ” as used in the law there is contemplated an increase in the capital of the corporation giving its shareholders the right to subscribe to new shares at less than the market value of the shares (3 Scott, Trusts [3d ed.], § 236.9.) When capital gains distributions are made by Broad Street they are not accompanied by any increase in its capital stock, nor are their shareholders required to pay for the additional shares they may elect to receive. Being unable to glean the settlor’s intention concerning the treatment to be *679 given those capital gains distributions, guidance must be sought in the presumptive canons of interpretation adopted by the courts and the Legislature ‘ ‘ to fill such gaps and to supply that for which the [settlor] has not lawfully provided.” (Central Union Trust Co. v. Trimble, 255 N. Y. 88, 93; cf. Bourne v. Bourne, 240 N. Y. 172, 175; Matter of Berger, 6 Misc 2d 468, 469, 470.)
The decisional law of this State, all of which was enunciated prior to 1963, is uniform in holding, absent any indication of contrary intent by the settlor, that dividend distributions of capital gains received by trustees from regulated investment companies constitute income distributable to the income beneficiaries. (Matter of Byrne, 192 Misc. 451 [1948]; Matter of Bruce, 192 Misc. 523 [1948]; Matter of Rosenthal, 110 N. Y. S. 2d 483 [1951]; Matter of Granath, N. Y. L. J. Nov. 24, 1952, p. 1260, col. 8; Matter of Hurd, supra; Matter of Appleby, supra; Matter of Bailey, 20 Misc 2d 539 [1959]; Matter of Snitzer, 33 Misc 2d 692 [1962].) Such was the posture of the decisional law when the Legislature enacted subdivisions 7 and 13 of section 27-e of the Personal Property Law (now EPTL 11-2.1, subd. [e], pars. [7] and [13]), which subsections, in pertinent part, provide: “ (7) Distributions made from ordinary income by a regulated investment company * * # are income. All other distributions made by such company * * * including distributions from capital gains * * * whether in the form of cash or an option to take new shares or cash or an option to purchase additional shares, are principal. * * * (13) * * * subparagraph (7) applies to trusts created on and after its effective date ”. The effective date was designated as June 1, 1965. The effect of that enactment was to abrogate the rule announced in the decisional law as to trusts created on and after its effective date and require that on and after June 1, 1965 all capital gains distributions made by regulated investment companies to trustees be allocated to principal. However, the statute having been made prospective in operation only, it has no application to trusts created prior to its effective date. Its terms specifically exempt such trusts from its operation. The trusts here involved were created prior to the effective date of the statute and are not subject to its mandate. (Cf. Matter of Hagen, 262 N. Y. 301, 305; Matter of Dodge, 39 N. Y. S. 2d 186,194, affd. 266 App. Div. 845; Matter of Comfort, 176 Misc. 807, 809.)
Nevertheless, the .guardian contends that when the Legislature made the statute prospective in operation only, it did not intend to codify pre-existing decisional law which allocated capital *680 gains to trust income. He suggests that, inasmuch as the decisional law of this State has been declared by courts having jurisdiction co-ordinate with that of this court, we should exercise the power and reject the reasoning of the decisional law and1 bring it into line with that part of the statutory enactment which applies to trusts created after the statute’s effective date. He cites Matter of Arens (41 N. J. 364) which dealt with the treatment, as between principal and income, of distributions with respect to corporate securities (not mutual fund shares) held as assets of a trust, wherein the court stated (p. 386):
‘1 Nor do we think the fact that our Legislature made the 1952 statute applicable only to trusts subsequently coming into existence in any way precludes us from changing the pre-1952 common law. We expressed the view in Fera that the exclusion of prior created trusts from the operation of the act did not codify any pre-existing rule governing apportionment, 2-6 N. J., at p. 142, and we do not conceive the Legislature intended thereby to foreclose the courts from changing judge-made law in the same field.” The guardian further contends that in none of the New York cases is it indicated that the courts closely analysed the uniqueness of the nature and business of mutual fund companies, the relationship between such a company and its shareholders, the source and substance of the distributions made by those companies, the similarity between a common trust fund (wherein capital gains dividends are treated as trust principal) and a mutual fund as a means of investment, the tax consequences of such distributions and the effect of their determinations upon the expectations of the average settlor. He states that where consideration was given to those factors in Tait v. Peck (346 Mass. 521), where the issue requiring determination involved Broad 'Street shares, the Massachusetts court determined that capital gains distributions of regulated investment companies were allocable to principal. Without conceding ■the omission of the New York courts to analyze all of those factors, as shall be seen, they were the subject of extensive consideration by a legislative commission and to a large extent motivated the commission in recommending to the Legislature the departure from the judicial rule as to trusts created after the effective date of the enactment. The question remains whether the Legislature intended that the judicial rule then in effect should govern the administration of trusts created prior to the' effective date of the statute. If so, recognition should be given to it. If not, only then should consideration be given to changing the judicial rule. To resolve the question a court may invoke ‘ ‘ the history of the passage of a statute, that is, *681 the changes and proposed changes in the original bill, as recorded in the legislative journals.” (Woollcott v. Shubert, 217 N. Y. 212, 221.) Also, resort may be had to the reports and notes of legislative commissions. (Matter of Pink [Walladmoy Realty Co.], 179 Misc. 46, 49.)
By chapter 731 of the Laws of 1961 the Legislature created the Temporary State Commission on the Law of Estates (Commission) to make a comprehensive study of pertinent laws, including the Personal Property Law, for the purpose of modernizing, simplifying and improving the law of estates. As a result of the Commission’s recommendation, chapter 1005 of the Laws of 1963 was enacted and became a law on May 3, 1963, repealing section 17-a of the Personal Property Law and inserting in its stead a new section 17-a. Subdivision 7 thereof contained the same verbiage as EPTL 11-2.1 (subd. [e], par. [7]) quoted above. By subdivision 12 of section 17-a it was provided that “ this section shall apply to any trust, whether created or declared before or after its effective date ’ ’. It was further provided that the act shall take effect June 1, 1964. In effect the enactment mandated that all capital gains distributions of regulated investment companies be allocated to principal whether the trust was created before or after its effective date. It was explained by the Commission that “ the delayed effective dates were to give the public an opportunity to consider with great care the new statutes, some of which made rather drastic changes in the New York law of estates, and to afford time at the 1964 Legislature within which to make any changes before the laws became effective.” (Third Report of Temporary Comm, on Law of Estates, N. Y. Legis. Doc. 1964, No. 19, p. 16; cf. pp. 35, 653.) Time was not sufficient to complete consideration of the changes, and by chapter 380 of the Laws of 1964 the effective date of the statute was postponed to June 1,1965. Additional meetings were held and reports submitted to the Legislature which indicate that extensive consideration was given to all of the factors which the guardian contends are unique and peculiar to the conduct of the business of mutual fund companies. (N. Y. Legis. Doc., 1964, No. 19, p. 653; N. Y. Legis. Doc., 1965, No. 19, p. 33; Minutes of Commission’s Meetings held on March 5, October 13, November 10, December 1, and December 8,1964, filed in the State Library; cf. N. Y. Legis. Doc., 1967, No. 19, p. 30.) Finally, as a result of the Commission’s recommendation, chapter 336 of the Laws of 1965 was enacted. By that act section 17-a of the Personal Property Law was repealed and a new section 27-e was adopted to replace it. Subdivision 7 of section 27-e was retained as now appears in EPTL 11-2.1 (subd. [e], par, [7]). However, subdi *682 vision 12 was renumbered 13 in section 27-e and revised, in relevant part, to provide that “ subdivision seven of this section shall apply to trusts created on or after its effective date ’’which was designated as June 1, 1965. A legislative note appended to chapter 336 of the Laws of 1965 states: “ The act also changes subdivision 7 of section 17-a of the Personal Property Law to provide that the rule allocating capital gains dividends of mutual funds to principal shall not apply to existing trusts. ’ ’ A more succinct clarification of what was intended with respect to trusts created prior to the effective date of the statute is found in the Fourth Report of the Commission (N. Y. Legis. Doc., 1965, No. 39, p. 33) where, with respect to a standby bill containing the same provisions as contained in subdivisions 7 and 13 of section 27-e, it was stated: “ Thus such capital gains will be allocated to income as to presently existing trusts and to principal as to trusts created after the effective date of the statute ” (emphasis supplied). (Cf. N. Y. Legis. Annual, 1965, No. 19, p. 198.)
Against that historical background the question is posed: should we now, by judicial rule, give retroactive effect to the statute when the Legislature, which was empowered to do so, deliberately refrained from so doing? The question must be answered in the negative. Confronted with the same question the Supreme Court of Vermont, when urged to change a judicial rule and thereby give retroactive effect to a statute which limited its application prospectively, expressed its attitude in Matter of Valiquette, (122 Vt. 350) as follows: “ Certainly our legislature was in a position to do all that we can do and it chose not to do more than it did; it did not set out to change the law retroactively. We think that although the legislative action was not pre-emptive in nature, it was close to it, and that this Court, or any other Vermont court, ought to be very reluctant about stepping into a situation and enlarging the scope of the enactment ’ ’. ‘ ‘ The general rule is that an original statute, or an amendment, will be construed as prospective only, unless the language clearly and plainly indicates a contrary purpose, and it will not be given a retroactive effect when it is capable of any other construction. ’ ’ (Walker v. Walker, 155 N. Y. 77, 81.) Here, in view of the positive actions of the Legislature, the reason for adherence to the general rule is more pronounced. Having initially given the statute both prospective and retrospective effect, it thereafter, but prior to its effective date, deliberately annulled the retroactive feature of the statute and limited its application prospectively. Were this court now to change the judicial rule and give retroactive effect to the statute it would enlarge its scope, thereby contravening the clear and plain intent of the *683 Legislature. Such change should he made by the Legislature, not by the courts.
I find that the Legislature clearly intended that the judicial rule in effect at the time of the enactment of subdivisions 7 and 13 of section 27-e of the Personal Property Law (now EPTL 11-2.1, subd. [e], pars. [7] and [13]) should govern the administration of trusts such as those here involved which were created prior to the effective date of the enactment. In consequence, the factors which motivated the courts in Tait v. Peck (346 Mass. 521, supra) and Matter of Brock, (420 Pa. 454 [1966]) to change the judicial rules in those States, by deciding that capital gains dividends of regulated investment companies are allocable to principal, need not be considered.
In Matter of Arens (41 N. J. 364, supra) cited by the guardian, the Supreme Court of New Jersey changed a judicial rule of construction to conform with a statutory rule which was limited to prospective application. The law enunciated in that case is not consistent with the law of this State. Also, the problem there involved differs markedly from that involved in this case. In Arens the issue requiring determination involved the apportionment between principal and income of extraordinary corporate dividends received by a trustee both before and after the effective date of the New Jersey statute (N.J. Stat., § 3A:14A-9). The judicial rule which was changed by that case bore similarity to the judicial rule declared in this State in 1913 in Matter of Osborne (209 N. Y. 450). The rule declared in Osborne governed trust indentures created prior to May 17,1926, the effective date of former section 17-a of the Personal Property Law which abrogated the apportionment rule with respect to trusts created after that date. In Matter of Hagen (262 N. Y. 301, 303, 305, supra) Crane, J., recognizing that the rule of Osborne was perplexing and “ proved to be confusing and at times unjust ”, nevertheless held that the provisions of former section 17-a of the Personal Property Law “ were not retroactive [and] we must do the best we can with the apportionment rule ”.
Thus, while in Arens the New Jersey court enlarged the scope of its statute by giving it retroactive as well as prospective effect, the Court of Appeals of this State, with similar circumstances existing, refused to do so. Ultimately, the Legislature changed the Osborne rule. (EPTL 11-2.1, subd. [e].) Additionally, there is not involved in this case the complex and at times unjust Osborne rule. At a meeting of the Commission held on December 8, 1964 (Minutes of Meeting, p. 15) it was stated that while two rules would result, one with respect to trusts created prior to and another applying to trusts created after the effective *684 date of the statute, they differ from the Osborne rule in its relation to former section 17-a of the Personal Property Law in that “ the Osborne rule was difficult and the new rule is easy to apply.”
The guardian cites the fact that during Pine’s existence the settlor acquiesced in the allocation of capital gains derived from the sale of Pine’s assets, largely real estate, to principal. He urges, in effect, that in the light of such conduct a practical construction of the trusts warrants the determination that the settlor intended that the capital gains distributions made by Broad Street also should be allocated to principal. The contention is not tenable. True, the practical construction of a settlor of a trust for many years has been recognized by the courts as a valuable factor in construing the trust provisions which are not clearly defined. (Matter of Erwin, 277 App. Div. 378, 384.) However, where the acts of the settlor are those which were in conformance with the provisions of the trusts or legally mandated, or where such conduct is not consistent with the theory advanced in aid of a practical construction, then aid to the construction may not be derived therefrom and is not controlling. (17A C. J. S., Contracts, p. 247.) The inference underlying the guardian’s contention implies that the settlor was empowered to direct or compel the declaration of a dividend by Pine from capital gains accrued from the sale of Pine’s real property or other capital assets and, after payment thereof to the trustees as stockholders, require that the trustees pay the same over to him as income beneficiary of the 1935 trust. Further, it is implied that the settlor having refrained from exercising that power it may be inferred that it was his intention that capital gains distributions made by Broad Street should be allocated to principal. The inference is founded upon a mistaken premise and may not be justified. Pine had been organized solely as a medium to afford fluidity to the handling of the trusts ’ realty. Its primary source of income was derived from rents realized from income producing realty. In fact, over a period of nine years prior to June 30, 1962, it paid dividends in excess of one million dollars from net earnings derived primarily from rentals. In two proceedings instituted in 1949 in the Supreme Court, New York County (Index Nos. 5892, 5893/1949) to construe the two trusts, judgments were entered which directed that after the settlor’s death new investments made by Pine were restricted to those legal for investment of trust funds under the laws of this State. The Judgments so directed notwithstanding the absence of such a limitation in Pine’s charter. To that extent the corporate structure was disregarded. It might be logically deduced by the *685 trustees that the provisions of Pine’s charter which permitted the distribution of capital gains as dividends might also be limited by the provisions of the trusts. If the charter was construed to be so limited, capital gains distributions would be determined upon the assumption that the corpora of the trust remained in the ownership of the trustees. Under such circumstances the rule is that profits or gains realized by a trustee over the inventory or purchase price on the sale of property constituting the corpus of the trust are allocable to principal. (Thayer v. Burr, 201 N. T. 155; 3 Scott, Trusts [3d ed.], § 233.1; cf. Matter of De Constantinovitch, 157 Misc. 328 [1935].) However, it is not necessary that the corporate structure be disregarded. The same rule would otherwise prevail. Assuming Pine had declared and paid dividends to the trustees, the source of which accrued from capital gains realized on the sale of Pine’s capital assets, the trustees would have been required to retain those dividends as principal under ‘ ‘ the general rule that profits from the sale of capital assets belong to the remaindermen as principal.” (Matter of Schaefer, 155 Misc. 850, 852.) Another factor must be considered. The settlor had divested himself of title to the trust property and after its transfer to Pine title thereto vested in Pine. The settlor was a member of the board of directors of Pine, but he was only one of the members. Three members of the board of directors were the individual trustees of the 1931 trust and two of the officers of the corporate trustee of both trusts. Any misapplication of Pine’s assets would have subjected those trustees to a surcharge to the extent thereof. (Matter of Horowitz, 297 N. Y. 252; Matter of Witkind, 167 Misc. 885, 893.) Except with respect to its investment policies, it may not be assumed that the settlor was in a position to dominate Pine. Having acquiesced in an allocation of capital gains that was legally mandated, there cannot be gleaned from the settlor’s conduct any intent on his part other than to comply with the provisions of the trusts and that which the law compelled.
The guardian contended that the settlor “contemplated” that Broad Street’s capital gains would be allocated to principal. He states in his memorandum that it must be assumed that the settlor was aware of the decisional law of this State and was aware of and relied upon the enactment of chapter 1005 of the Laws of 1963 which provided for the retrospective nullification of the decisional law. He states that “ but for this proposed enactment, which was to be effective June 1, 1964, it is almost certain that the settlor would not have arranged or consented to the proposed exchange of Pine and Broad Street assets.” To support his position the guardian produced a witness who from *686 1936 had been a bookkeeper for Pine and from about 1956 had been its president and treasurer. He testified that the settlor had suffered two heart attacks, one in 1958 and another in September, 1962; that in the interval between those occurrences and while the settlor was endeavoring to negotiate the exchange of Pine’s assets for Broad Street shares the settlor stated to him that it was his “ expectation ” that “ the income from Broad Street was to be paid to the children (the income beneficiaries), and the capital gains were to be accumulated for the grandchildren ’ ’ (the remaindermen); and, that he overheard a conversation between the settlor and one of the officers of the corporate trustee concerning pending legislation in Albany and that the settlor’s “ hopes were that it would be determined that capital gains ” distributions of mutual fund companies would not be “ distributed to income beneficiaries but accumulated for the benefit of remainders [sic] ’ ’.
Objection having been made to the introduction of the testimony, it must be stricken. (Higgs v. De Maziroff, 263 N. Y. 473.) “ The rules of construction are well settled. The intention of the grantor is that intent revealed by the words used in the trust instrument and not his secret wishes, desires or thoughts after the event. The court is limited to the four corners of the instrument. [Matter of Durand, 250 N. Y. 45; Bank of New York v. Kaufman, 26 N. Y. S. 2d 474, affd. 261 App. Div. 818, mot. for lv. to app. den. 261 App. Div. 898.] Extrinsic evidence may be proper in a case of true ambiguity or to illuminate the circumstances surrounding the execution of the indenture but it can never serve to contradict the language of the trust indenture or to insert provisions for which there is no basis therein.” (City Bank Farmers Trust Co. v. Macfadden, 65 N. Y. S. 2d 395, 397.) ‘1 The instrument must be deemed to speak as of the time of its date, and to be interpreted by conditions existing at that date, and subsequent events can have no bearing in its interpretation.” (Cary v. Carman, 116 Misc. 463, 470.) “ It is the intention which exists at the time of execution which controls, not one thereafter formulated and not expressed in the instrument.” (Matter of Nicol, 24 A D 2d 191,197, mod. on other grounds 19 N Y 2d 207; cf. Brown v. Quintard, 177 N. Y. 75, 83; Morris v. Sickly, 133 N. Y. 456, 459; Restatement, Trusts, § 164, Comment a). “ It is likewise well settled that if the settlor does not reserve the power to modify a trust his attempt to do so is ineffectual.” (Matter of Woodward, 284 App. Div. 459, 462; Restatement Trusts, § 331, Comment a.)
The trust indentures specifically provide that the settlor ‘ ‘ may not amend the terms and dispositions of the corp(ora) or prin *687 eipal and income or accumulated income of the trust estate (s) adversely to the interests of any person beneficially interested therein without the consent of such person. ’ ’ The income beneficiaries have not consented to any amendment of the trusts. Also, in November, 1935, after the execution of the instruments, the settlor relinquished all power to alter, modify or amend them. As heretofore indicated, neither the trust instruments nor any extrinsic circumstances disclose the settlor’s intention at the time of the execution of the instruments concerning the allocation, as between principal and income, of capital gains distributions payable at the election of the trustees in cash or additional shares of a corporation’s stock. Nor does the testimony of the witness supply that omission. The testimony relates solely to events which occurred in 1958 and thereafter. The settlor’s “ contemplation ” as suggested by the guardian or his ‘1 expectations ” and “ hopes ” allegedly expressed to the witness more than 20 years after the execution of the instruments cannot be deemed to relate back to 'his unexpressed intention in 1935. To give effect to those expectations and hopes would be tantamount to permitting a modification or amendment of the provisions of the instruments concerning the disposition of principal and income, a right which the settlor had relinquished both in the trust indentures and by separate instruments. “ Under the guise of interpretation extrinsic evidence cannot be utilized for the purpose of adding to the [trusts] provisions which otherwise are not found there at all.” (Fries v. Osborn, 190 N. Y. 35, 39.)
The testimony of the witness must also be treated with some skepticism. Except to state with certainty that the conversations he referred to occurred in the interval between the latter part of 1958 and September, 1962 when the settlor suffered a second heart attack, he was reluctant to fix with any degree of definiteness the approximate times of the conversations during the approximate four-year period. The fact is that the 1963 session of the Legislature did not convene until January 9, 1963 and the bills enacting chapter 1005 of the Laws of 1963 were not filed in the Senate and Assembly until February 18,1963. (Senate Intro. No. 2770 and Assembly Intro. No. 4173; cf. N. Y. Legis. Record and Index, 1963, pp. 225 and 717.) The enactment became law on May 3, 1963, about one and one-half months after the settlor’s death. The first public record indicating that the commission proposed to recommend to the Legislature a statutory change in the decisional law is contained in the Second Report of the Commission (N. Y. Legis. Doc., 1963, No. 19, pp. 178-281) dated March 31, 1963, after the settlor’s death. Under such circumstances it cannot be conceived that the settlor was aware *688 of and relied on the enactment. Certainly there was no legislation pending on the subject at the time the witness claims that he overheard a conversation between the settlor and one of the officers of the corporate trustee concerning that subject. Also, no probative value can be attributed to his testimony concerning the settlor’s expectation that Broad Street’s capital gains “ were to be accumulated for the grandchildren.” Unless the settlor had access to information resulting from the Commission’s deliberations prior to the submission of the Commission’s Second Report, which cannot be conceived and is not reflected in the record of these proceedings, there was no foundation for the statement of his expectation allegedly made to the witness. The settlor was aware of the decisional law and there was no reasonable basis upon which he could have predicated the expectation at the time related by the witness.
The guardian contends that “ in the normal situation, a settlor would expect a trustee to act fairly toward each class of beneficiary and not favor one class at the expense of another ” and “ to invest the trust corpus in such a manner as to provide for both reasonable current income and reasonable growth of principal. He maintains that these expectations would be frustrated if, in addition to ordinary investment income, capital gains dividends were also credited to income.” He states that ‘1 there would be no normal growth of principal since all of the growth that is distributed by the investment company would be allocated to the income beneficiary. ’ ’ In that respect he offered, and there was received in evidence, a prospectus of Broad Street which incorporates a record of Broad Street’s operations over the 10-year period from December 1,1953 to December 31,1962.
Under the circumstances involved in these proceedings we must look, not at what a settlor would expect a trustee to do, but at what the settlor did when, in the exercise of his power to direct the investment policy of Pine and the trusts, he, on behalf of Pine, entered into the agreement with Broad Street’s officers to exchange Pine’s assets for Broad Street’s stock. As will be shown, the trustees, when they consented that Pine enter into the formal agreement with Broad Street and applied to the court for permission to consummate the agreement, were merely performing the ministerial duties of effectuating the settlor’s investment decision. It is not disputed that the settlor was aware of Broad Street’s objectives, operations, and its dividend distribution policy. Broad Street’s objectives, as stated in the prospectus, are: “ Broad Street Investing tries as its primary investment objective to produce favorable current income and long term growth of income, with due regard to preservation of capital *689 values. Attention is given not only to the dollar amount of dividends hut to the buying power of income paid to shareholders. Long term growth of capital values also is an important objective.” The record of its operations indicate that the net asset value per share of its stock as of December 1, 1953 was $7.61 and as of December 31, 1962 it had increased to $12.88, reflecting a growth in net asset value per share of $5.27. Over the same period it paid, on a per share basis, ordinary income distributions of $4.238 and capital gains distributions of $3.058, a total of $7.296. I cannot conceive that the difference between the increase in net asset value per share of $5.27 and the total distributions of $7.296 constitutes a disparity that may be characterized as inequitable or unfair as between the income beneficiaries and the infant remaindermen. Particularly under the circumstances of this case it may not be deemed to be inequitable when it is considered, as it must have been considered by the settlor, that the income beneficiaries are charged with the responsibility for the support, maintenance and education of their children, the infant remaindermen. Indeed it would have been inequitable toward the income beneficiaries had they been limited to the receipt of ordinary income of $4.24 per share .over that 10-year period while the remaindermen over the same period would have benefited from both the increase in the growth of the net asset value per share plus the capital gains distributions, the total of which would have been $8.328 per share. Considering the record of operations as the settlor must have, I am convinced that the settlor would not have intended the inequity inherent in the latter situation to have occurred.
Under that aspect of res judicata referred to as collateral estoppel, the guardian urges that the judgment entered on March 24, 1964 in the Supreme Court, New York County (Index No. 13678/1963) in a proceeding to construe the trusts, estops and concludes the income beneficiaries with reference to their claim that Broad Street’s capital gains distributions should be allocated to income. That proceeding was instituted in August, 1963, after the enactment of chapter 1005 of the Laws of 1963 amending section 17-a of the Personal Property Law, and the judgment was entered prior to June 1,1964, the effective date of the enactment. In briefs submitted to the court in that proceeding by the attorneys for the trustees statements were made which referred to the proposed statutory amendment. The guardian claims that by reason of the assertion of those statements it was contemplated by the trustees and the court that capital gains distributed by Broad Street would be allocated to principal, and, in conse *690 quence, the judgment entered in that proceeding operates as an estoppel to claim otherwise.
The necessity for the institution of that proceeding arose by reason of one of the terms contained in the agreement between Pine and Broad Street, dated August 12, 1963, which provided that the obligations of Pine and Broad Street were subject to the condition that a judgment be obtained authorizing the exchange of Pine’s assets for Board Street’s stock. The judgment was required because of certain iestrictions contained in both trust instruments and in two judgments entered on January 31, 1950 in the Supreme Court, New York County (Index Nos. 5892, 5893/1949) in companion proceedings to construe both trusts. The trust indentures provided that during the settlor’s lifetime the trustees were authorized to hold as an investment any property coming into their hands although the same was not of a character permitted for investments of trust funds in this State, but after the settlor’s death new investments by the trustees were restricted to those legal for fiduciaries. The companion judgments construing the trusts granted similar privileges and placed similar restrictions on Pine’s investments. The judgments further provided that the restrictions placed on Pine would be applicable to any successor of Pine. The Broad Street investment, as contemplated, was one not legal for trust funds'. To obtain a judgment authorizing the exchange, the trustees instituted a proceeding by a petition to the Supreme Court, New York County (Index No. 13678/1963) requesting that the court issue an order to show cause, submitted therewith, directing the necessary parties interested in the trusts to show cause why the court (1) “ should not construe the provisions of the 1931 and 1935 Indentures and instruct the petitioners as requested (t)herein; (2) instruct (the) petitioners that they may acquiesce in the exchange of Pine’s assets for Broad Street’s stock in accordance with the agreement of August 12, 1963, and in the subsequent dissolution of Pine, that they may retain the stock of Broad Street received by them upon such dissolution * * # (and) (3) limit the provisions of the prior companion orders of this court, dated January 31, 1950', to the extent that they be held to have no application to Broad Street upon the receipt by it of Pine’s assets. ’ ’
“ There are two main rules of res adjudicata. One is that a judgment of a competent court, on the merits, is a bar to any future suit between the same parties or their privies upon the same cause of action. The other is that a point directly in issue and judicially passed upon in a judgment of a competent court, on the merits, cannot be again drawn in question in any future *691 action between the same parties or their privies whether the cause of action is identical or not.” (Hollenbeck v. Ætna Cas. & Sur. Co., 215 App. Div. 609, 611, affd. 243 N. Y. 540.) However, “ it has never been held that a judgment is an estoppel as to all the litigated facts and all the evidence which the one party or the other may choose to introduce upon the trial of the action, however important such evidence may have been. The estoppel extends to the material facts which are in issue between the parties to the action, and to such as necessarily bear upon, control and are essential to the adjudication made.” (House v. Lockwood, 137 N. Y. 259, 270; cf. Stokes v. Stokes, 155 N. Y. 581, 592; Karameros v. Luther, 279 N. Y. 87.) The judgment ‘1 is final only as to such facts as are litigated and decided, which have such a relation to the issue that their determination was necessary to the determination of that issue.” (Rudd v. Cornell, 171 N. Y. 114, 128.) To determine whether the precise issue involved in these proceedings was material, relevant and necessary to the determination made in that proceeding, and was actually litigated and determined therein, reference must be made to the record of the prior proceeding.
An examination of the order to show cause, the petition and exhibits annexed thereto discloses that no request was made for a determination concerning the allocation of Broad Street’s capital gains distributions. In fact, no reference was made thereto in any of those papers. No trial of the issues presented by the petition was held. The court made its determination based on the allegations of the petition, and the material and relevant facts and legal principles contained in the two briefs submitted by separate counsel representing the individual and corporate trustees and the report of the guardian ad litem appointed by the court to represent the infant remaindermen. The main thrust of the briefs submitted by the attorneys for the trustees was designed to demonstrate that within the intendment of the trusts and the prior companion orders of the court the uncompleted exchange of Pine’s assets for Broad Street’s stock occasioned by the settlor’s death should be consummated primarily because of the action taken by the settlor during his lifetime to negotiate and complete the transaction. In the brief submitted on behalf of the corporate trustee it is stated: “It is apparent from the wording of the trust instruments that Mr. Balsam in creating the trusts chose to reserve to himself as long as he possibly could the power to direct all investment decisions with respect to the corpora of the trusts (Real Prop. Law, sec. 144; Rice v. Halsey, 156 App. Div. 802, affd. 215 N. Y. 656). Only when he was *692 unable to exercise such reserved power, e.g\, after his death, where new investments to be selected by the trustees and limited to those legal for fiduciaries. In contrast, the trust instrument mandatorily imposed upon the trustees the ministerial duties of effectuating Mr. Balsam’s investment decisions and during his life such .duties were their only responsibilities. It therefore seems quite clear that, insofar as the trust instruments are concerned, if Mr. Balsam prior to his death had exercised his reserved power with respect to a particular investment and duly notified the trustees of such exercise they would be obliged to make the investment as directed, even though the actual completion of the investment took place after his death. ’ ’ It was also contended that the oral agreement made by the settlor on behalf of Pine was a binding commitment which the two corporations were prepared to perform. It was then asserted that “(a)s a natural concomitant to the determination that the proposed exchange of Pine’s assets for Broad Street’s stock is appropriate for the reasons stated * * *, this Court should also determine that the receipt by the trustees of the Broad Street stock upon the dissolution of Pine does not constitute a new investment made by them after Mr. Balsam’s death. The basic premise for such a second determination is also the fact that Mr. Balsam had made the decision to acquire the Broad Street stock for the trusts prior to his death, which decision was the operative fact under the trust indentures.” The point was also briefed that “ the term ‘ successor ’ as used in the companion orders should not be deemed to include Broad Street. ’ ’ Similar contentions were urged in the brief submitted by the attorneys for the individual trustee. It is in this brief that the attorneys refer to the allocation of capital gains distributions made by regulated investment companies. The brief states: “ With respect to the allocation between principal and income dividends distributed by a regulated investment company, the present New York law requires a trustee to treat the entire distribution as income in spite of the fact that a portion may be attributable to long term gains. See, Matter of Bailey, 20 Misc 2d 539,188 N. Y. S. 2d 1005 (Surr. Ct. Westch. Co. 1959). However, Section 17-a of the New York Personal Property Law, which will become effective June 1, 1964, provides for the apportionment of such distributions between principal and income. This section, added by chapter 1005 of the Laws of 1963, provides in pertinent part: [There follows a recitation of the provisions of the section.] Thus, all dividends received by the Trustees from Broad Street on and after June 1, 1964, would be apportioned equitably between the *693 life beneficiaries and the infant remaindermen in accordance with the provisions of the new statute. ’ ’ Similar reference, in one sentence, was made to the statutory amendment in the brief submitted on behalf of the corporate trustee. The conclusions of both briefs were confined to the requests that the court construe the trusts and the companion judgments entered in the prior construction proceedings to the extent requested in the petition. Neither brief requested that any determination be made concerning the allocation of capital gains distributions to be received from Broad Street should the court approve the application. Significantly, the guardian for the infant remaindermen, who examined those briefs prior to the preparation of his report, restricted his report to the issues raised by the petition and made no comment concerning Broad Street’s capital gains distributions.
No reference to capital gains distributions was made in either the court’s decision or the judgment entered thereon. The court’s decision states: “ In the premises and circumstances here presented the investment, or proposed transaction, is permissible within the framework of prior orders herein and since the transaction does not constitute a new investment within the intendment of the trust instrument the trustees may acquiesce in the proposed uncompleted exchange of stocks. The prior orders are thus limited in their application, as petitioned, and the guardian ad litem’s report herein is confirmed.” The judgment decrees that the relief requested in the petition be granted, and no more.
Based on the record -of the prior proceeding the conclusion is required that the guardian has failed to establish that the former judgment concludes the income beneficiaries with respect to their claim in this proceeding. The statements made in the briefs were not material, relevant or necessary to the determination in the former proceeding. The issues requiring the court’s determination in that proceeding involved a construction of restrictive provisions of the trusts and prior companion judgments in the light of actions taken by the settlor pursuant to his reserved power to direct the trustees ’ investment policies. The gratuitous statements in the briefs bore no relevancy to those issues. The pertinent provisions of the trusts and prior judgments required to be construed contained no reference to distribution of the principal and income of the trusts. A judgment may not operate as an estoppel as to statements contained in a brief which are surplusage and not germane to the issues requiring determination. The statements made in the briefs were mere surplusage. Nor was the matter raised by the statements actually litigated and determined. In a proper sense there was no adversarial *694 litigation of the issues involved in the former proceeding. In his report the special guardian joined with the trustees and recommended that the relief requested in the petition be granted. Recognizing the irrelevancy of the statements in the briefs he made no comment thereon. Certainly, the issue, if it may properly be called one, was not determined. Neither the court’s decision nor the judgment referred to it. Not having determined the issue, either expressly or by implication, I cannot agree with the guardian that the court contemplate that Broad Street’s capital gains distributions would be allocated to principal. If the court chose to deviate from the decisional law as it then existed it would have so expressed itself. It did not. The statute not having been effective as of the time that the court rendered its decision and signed the judgment, the court could not have determined that capital gains distributions were to be allocated to principal based on the statutory provisions.
I agree with the guardian that at the time the trustees made their statements in the briefs they did contemplate that capital gains distributions would be allocated to principal. They contemplated such disposition, not because of any contemplation, expectation or hope of the settlor, but, as stated in the briefs, because of the enactment of chapter 1005 of the Laws of 1963. The action taken by the Legislature in 1965 could not have been foreseen then. Nevertheless, implicit in the reference in the briefs, first to the decisional law and then to the change proposed by chapter 1005 of the Laws of 1963, is the indication that it was their intention to make capital gains distributions as mandated by the controlling law, decisional or statutory, whichever may be applicable, the trust instruments being silent with respect thereto.
The burden was on the guardian to establish the elements necessary to sustain the plea of estoppel by prior judgment (Rudd v. Cornell, 171 N. Y. 114,127, supra; People ex rel. Village of Chateaugay v. Public Serv. Comm., 255 N. Y. 232, 238, 239; Silberstein v. Silberstein, 218 N. Y. 525, 529). “ And, if there be any uncertainty, the prior judgment is not conclusive (Bell v. Merrifield, 109 N. Y. 202; Lyman v. Billy Rose’s Exposition Spectacles, 267 App. Div. 532) ”. (City Bank Farmers Trust Co. v. Macfadden, 13 A D 2d 395, 404.) The burden has not been met.
Both trusts, having been created prior to the effective date of EPTL 11-2.1 (subd. [e], par. [7]), are construed to mean that the distributions from capital gains paid and to be paid to the trustees by Broad Street, a regulated investment company, are income distributable to the income beneficiaries.
*695 We now turn to the third proceeding brought by the executors of the last will and testament of the settlor, Aldo B. Balsam (who shall be hereinafter referred to as the “ decedent ”). They seek approval of the allocation and apportionment of estate taxes among the decedent’s residuary estate and three inter vivos trusts created by the decedent, including the 1935 trust.
Preliminary to reaching the question of apportionment it is necessary to construe paragraph “ First ” of the decedent’s will which, in pertinent part, provides: “ I direct that * * * all estate * * * taxes of every kind that may become payable by reason of my death in respect of my own testamentary estate * * * shall be paid from the principal of my residuary estate as expenses of administration and shall not be apportioned. ’ ’ A guardian ad litem, other than the one appointed on the issue involving the capital gains distributions of regulated investment companies, was appointed to represent the interests of the infant remaindermen on this issue. He contends that by the quoted language of the will the decedent directed against apportionment of estate taxes with respect to both his testamentary and non-testamentary estate. He urges that all estate taxes be charged against the decedent’s residuary estate. The decedent’s widow, to whom he left his entire residuary estate in a qualifying marital deduction trust, opposes that contention, and asserts that estate taxes should be apportioned among all persons interested in decedent’s gross taxable estate, both testamentary and nontestamentary.
Whether apportionment of estate taxes is required and, if so, the rules governing the same, are determined by section 124 of the Decedent Estate Law, (now EPTL 2-1.8). Subdivision 1 provides that estate taxes 1 ‘ except in a case where a testator otherwise directs in his will, and except in a case where by any instrument other than a will, hereinafter called a ‘ non-testamentary instrument ’, direction is given for apportionment within the fund of taxes assessed upon the specific fund dealt with in such non-testamentary instrument, shall be equitably apportioned among the persons interested in the gross tax estate ”. Subdivision 4 provides: “Any direction as to apportionment or non-apportionment of the tax, whether contained in a will or in a non-testamentary instrument, shall be limited in its operation to the property passing thereunder unless such will or instrument otherwise directs.” The only reference to an apportionment or exoneration from apportionment of estate taxes in any of the instruments before the court is that contained in the decedent’s will. It is clear that it was the intent of the decedent to direct against apportionment of estate taxes as to all property passing *696 under his will, charging payment of the taxes against his residuary estate. It is as equally clear that he intended to limit the direction against apportionment solely with ‘1 respect to my own testamentary estate ”. He did not intend that estate taxes on his nontestamentary estate be charged against his residuary estate. Consequently, estate taxes on decedent’s nontestamentary assets are subject to the apportionment mandate of section 124. (Matter of Leonard, 16 Misc 2d 465, affd. 9 A D 2d 1; Matter of Mills, 189 Misc. 136, affd. 272 App. Div. 229, affd. 297, N. Y. 1012.)
It appearing that apportionment is required and there being no other objections to the apportionment of estate taxes among the interests involved, the apportionment as shown in Schedule J is approved. No objection has been raised either as to the reasonableness or apportionment of attorneys’ fees. Considering the volume of services rendered and the benefits received by the respective testamentary and nontestamentary interests they are approved in amounts and as apportioned in Schedule J.
There remains for determination the issue involving the apportionment of estate taxes and attorneys’ fees among the persons interested in the 1935 trust. Other than the property passing under the decedent’s will, which had a taxable value of $204,630.24, there are three distinct items of property contributing to the decedent’s gross taxable estate. They are described in Schedule J annexed to the petition as: (1) A trust established by the decedent on July 14, 1931 (hereinafter referred to as the “ insurance trust ”). The decedent’s son, Richard Aldo Balsam, was the sole beneficiary of the proceeds received by the trust from insurance policies on the decedent’s life which had a value for estate tax purposes of $160,287.40. The proceeds were fully taxable in the estate. Estate taxes of $66,927.76 were paid with respect to taxable value. (2) A trust established by the decedent on March 21, 1929 (hereinafter referred to as the “ securities trust ”). The trust terminated on the decedent’s death and each of the decedent’s three children, Richard, Maria Balsam Milone and Suzanne Balsam Nagel, received one quarter of the principal. The decedent’s widow received the remaining one quarter free of tax. The value for estate tax purposes of the portion of the trust which was distributed equally among the decedent’s three children was $573,820.32. Only 2.81% thereof, or $16,124.35, was includable in the decedent’s gross estate for estate tax purposes. Estate taxes of $5,766.51 were paid with respect to 2.81% of $573,820.32. (3) The 1935 trust. The value of the principal thereof for estate tax purposes was $1,921,361.33. The principal *697 was includable in the decedent’s gross estate for estate tax purposes to the extent of 75.23%, or $1,445,440.13.
Estate taxes in the sum of $547,249.08 were paid with respect to 75.23% of $1,921,361.33. Under the particular circumstances of survivorship which existed at the time of decedent’s death, the 1935 trust provided that the corpus thereof be divided in four shares for the benefit of his three children and his niece, Marian Morton Brown. In effect, he directed that the respective four shares be determined, by allocating such amounts of the corpus to each of the four beneficiaries so that the share of his niece would consist of such an amount that the share of each of the children ‘ ‘ when added to the share accrued to each such child or issue by virtue of the aforesaid Indenture of Trust dated the 21st day of March, 1929, and accrued to Richard Aldo Balsam by virtue of the aforesaid insurance upon the life of Aldo R. Balsam, will be equal to the amount of the share of ” Marian Morton Brown. Neither the 1935 trust indenture nor any other instrument makes provision for the manner of apportionment of estate taxes or other proper charges against the respective interests of the four beneficiaries of the trust.
When apportionment of estate taxes is required, subdivision 3 of section 124, provides that “ (i) apportionment of the tax shall be made among the persons benefited in the proportion that the value of the property or interest received by each such person benefited bears to the total value of the property and interest received by all persons benefited, the values as finally determined in the respective tax proceedings being the values to be used as the basis for apportionment of the respective taxes; (ii) any exemption or deduction allowed under the law imposing the tax by reason of the relationship of any person to the decedent or by reason of the fact that the property consists of life insurance proceeds * * * shall inure, to the benefit of the person bearing such relationship or receiving such insurance proceeds * * * as the case may be; (iii) any deduction for property previously taxed and any credit for gift taxes paid by the decedent shall inure to the benefit of all persons benefited, and the tax to be apportioned shall be the tax after allowance of such deduction and credit ’ ’.
No difficulty is encountered in apportioning the taxes among the persons benefited with respect to the insurance and securities trusts. The insurance trust was fully taxable and Richard, as the sole person benefited, is chargeable with the entire tax burden thereon. The value of the securities trust as determined in the estate tax proceeding was $16,124.35 and the estate tax thereon was $5,766.51. Each of the decedent’s three children shared *698 equally in the trust. Therefore, the taxable value of the respective share of each child is one third of $16,124.35, or $5,374.78, and their respective shares of the estate tax burden were one third of $5,766.51, or $1,922.17.
Unlike the equal division of the securities trust, the 1935 trust is directed to be divided into unequal shares according to the formula provided by the decedent in the 1935 trust instrument. The decedent’s day-of-death value of the insurance trust ($160,-287.40), the securities trust ($573,820.32), and the 1935 trust ($1,921,361.33), amount in all to $2,655,469.05. One quarter thereof is $663,867.26. Applying the decedent’s formula, each of the four beneficiaries of the 1935 trust is entitled to receive a value, whether through the 1935 trust or through that trust in combination with that received by certain beneficiaries from the insurance and securities trusts, of one fourth of $2,655,469.05, or $663,867.26 each. The decedent’s son, Richard, having received $160,287.40 from the insurance trust and $191,273.44 as his share of the securities trust, his share of the 1935 trust is $312,306.42. Each of the decedent’s daughters, Maria and Suzanne, having received $191,273.44 as their respective shares of the securities trust, their respective shares of the 1935 trust are $472,593.83. The decedent’s niece, Marian, not having participated in either the insurance or securities trusts, her share of the 1935 trust is $663,867.26. It therefore appears that the value of the respective shares of the four beneficiaries and the percentage of the value of their shares of the corpus of the trust as of the decedent’s day of death is as follows:
Marian Brown........ 34.552% $ 663,867.26
Richard Balsam...... 16.254% 312,306.42
Maria Milone......... 24.597% 472,593.83
Suzanne Nagel........ 24.597% 472,593.82
100.000% $1,921,361.33
However, 24.67% of the value of the 1935 trust was excluded from decedent’s taxable estate, so that the value of the taxable portion of the trust was $1,445,440.13. Consequently, the taxable portion of the respective shares of the beneficiaries is 75.23% of their respective shares. The method of apportioning the estate tax burden against the respective beneficiary’s taxable share is to apply to the total taxable value of the 1935 trust ($1,445,440.13) and to the taxes allocated thereto ($547,249.08) the proportion or percentage that each of the four shares of the trust bears to the whole of the 1935 trust ($1,921,361.33). Applying that apportionment, the value of the taxable portion of the *699 respective share of each of the four beneficiaries and their respective apportioned shares of the tax burden with respect to their taxable interests are determined are as follows:

Proportion Taxable Value Share of Tax

Marian Brown...... 34.552% $ 499,428.47 $189,085.50
Richard Balsam .... 16.254% 234,941.84 88,949.86
Maria Milone....... 24.597% 355,534.91 134,606.86
Suzanne Nagel ..... 24.597% 355,534.91 134,606.86
100.000% $1,445,448.13 $547,249.08
The attorneys’ fees apportioned against the 1935 trust shall be apportioned against the beneficiaries of the 1935 trust in the same proportion or percentages as the percentage of the value of their shares of the corpus of the 1935 trust.
Submit orders, on notice, in each of the proceedings in conformity with the foregoing determinations.