Letitia M. Tait *vs.* Mildred Tait Peck & others.

Hampden. November 6, 1963. — December 4, 1963.

Present: Spalding, Whittemore, Cutter, & Reardon, JJ.

*Trust,* Principal or income, Investments. *Investment Company.*

Distributions from capital gains by a regulated investment company to a trustee holding shares of the company, whatever the form of the distributions and the option of the trustee shareholder as to their form, should be treated as principal of the trust, and not as income payable to the income beneficiary, in the absence of any provision governing their treatment in the trust instrument.

PETITION IN EQUITY filed in the Probate Court for the county of Hampden on May 3, 1962.

The case was reported by *Smith, J.,* without decision.

*John I. Robinson* for the petitioner.

*Milton J. Donovan* for the respondents Mildred Tait Peck & others.

*Warren Motley & Ansel B. Chaplin* for The Investment Company Institute, amicus curiae, submitted a brief.

CUTTER, J. Letitia M. Tait (the widow) seeks a declaratory decree with respect to an inter vivos trust (the trust) executed in 1935 by her late husband (the settlor). She asks the court to determine whether a certain distribution of capital gains to the trust, made by Broad Street Investing Corporation (Broad Street) in December, 1961, is to be treated as principal or income of the trust. The widow, life beneficiary of the trust, asserts that the capital gains distribution is income. The individual remaindermen and the trustees assert that it is a return of capital and hence should be added to principal. The parties filed an "Agreement as to the Evidence and All Material Facts," constituting a case stated. The probate judge reported the case, without decision, for the consideration of the full court. The facts as agreed are set forth below.

On December 9, 1935, the settlor transferred to the trustees, subject to the trust, 100 shares of Linden Associates (Linden) a Massachusetts trust. He "provided . . . that in the event of . . . liquidation of . . . Linden . . . during the [widow's] life . . . the [t]rustees . . . shall receive from . . . Linden . . . 'the distributive share in the assets of . . . Linden . . . properly allocable to them' " in trust "to pay over the net income . . . monthly to . . . [the widow] during her life, and upon her death to pay over . . . [the] trust fund . . . to" others. The settlor died on September 20, 1940. The holders of the vested remainder interests have been determined by an earlier court decree.

"Linden . . . was liquidated following the sale, as of July 12, 1961, of all its assets to Broad Street." The trust received 55,434 shares of Broad Street in exchange for the

shares of Linden then held by it.  In 1961, subsequent to July 12, Broad Street paid to the trustees of the trust two cash dividends from income and in addition, in December, 1961, Broad Street delivered to the trustees 1,463 additional shares of Broad Street as "distributions of gain," as distinguished from "dividend from income," on the shares then held by the trustees.  The trustees paid to the widow the 1961 dividends from income paid to them by Broad Street in 1961 (less expenses and taxes) "but refused and still refuse to transfer" to the widow the 1,463 shares of Broad Street (less any expenses or taxes thereto allocable). The trustees, in support of their position, state that under Int. Rev. Code of 1954, § 852, the trustees must pay a Federal capital gains tax (see fn. 1, *infra*) on these shares of Broad Street so received as "distributions of gain."

"In the past quarter of a century or so, there . . . [have] grown up [see Wiesenberger, Investment Companies (1963 ed.) part 1] in our investment economy so-called [m]utual [i]nvestment [t]rusts, wherein each share of the [t]rust . . . held . . . represents a share in the ownership of a number of [diversified] companies . . . [so that] the investor has a broad spread of risk and the benefit of the general investment management of the [m]utual [t]rust.  It derives its earning from net income received in the form of dividends and interest paid on securities . . . held by the [investment] company, and also from net profits realized on the sale of [its] investments . . . .  Broad Street . . . is such a . . . [company], subject to the operation of the Investment Company Act of 1940, as amended [see 15 U.S.C. §§ 80a–1 to 80a–52 (1958), and Supp. IV, 1959–1962]. It is so classified for tax purposes under the Internal Revenue Code" (Subchapter M — Regulated Investment Companies, Int. Rev. Code of 1954, §§ 851–855).[1]

In its statements to the public, Broad Street says that its investments have two goals — (1) favorable current in-

---

[1] By Int. Rev. Code of 1954, § 852 (b) (3) (B), a capital gain dividend is to be treated by shareholders of an investment company as a gain from the sale or exchange of a capital asset held for more than six months.

come, and (2) long term growth in both income and capital value.[2] Dividends payable out of net income are paid quarterly, whereas distributions of gain realized on the sale of investments are paid at the end of each year. Since 1945, except for 1949, Broad Street has paid dividends from income. It has also paid distributions of capital gain to its shareholders either in stock, or in cash, at the option of the shareholder, except for the years 1936, 1937, and 1944 when capital gain distributions were paid in cash. The 1,463 shares were paid to the trustees in December, 1961,[3] at their request. At their option, they could have received the equivalent of these shares in cash.

1. No party contends that the inter vivos trust shows what the settlor's intent was with respect to capital gains dividends. There are no special provisions concerning the allocation of receipts as between principal and income. Cf. *Dumaine* v. *Dumaine,* 301 Mass. 214, 222–224. Because the original trust fund consisted of shares of Linden, there may be (wholly apart from the usual investment powers of a

---

[2] The following data concerning Broad Street are set out in the case stated.

| Calendar Year | Net Asset Value (Year End) | Dividends From Investment Income | Distributions From Security Profits |
|---|---|---|---|
| 1961 | $14.59 | $0.44 | $0.39 |
| 1960 | 12.29 | 0.44 | 0.30 |
| 1959 | 12.93 | 0.44 | 0.24 |
| 1958 | 12.68 | 0.44 | 0.325 |
| 1957 | 9.85 | 0.435 | 0.235 |
| 1956 | 10.93 | 0.43 | 0.515 |
| 1955 | 10.86 | 0.41 | 0.37 |
| 1954 | 9.75 | 0.39 | 0.26 |
| 1953 | 7.24 | 0.373 | 0.153 |
| 1952 | 7.61 | 0.367 | 0.15 |
| 1951 | 7.19 | 0.367 | 0.243 |

[3] On December 5, 1961, there was a distribution of fourteen cents a share "dividends from income" and a distribution of "distributions of gain" of the equivalent of thirty-nine cents a share. Prior to the distribution, the bid price of a share of Broad Street was $15.32. Immediately after the distribution, the bid price a share was $14.77, a decrease of fifty-five cents. A roughly comparable decrease was experienced in respect of the asking price. "The bid price per share is arrived at by dividing the net assets of the company by the number of outstanding shares. The asking price is arrived at by taking this figure and adding to it [as a selling charge] seven and one-half per cent . . . of the offering price."

trustee in Massachusetts) special indication of the settlor's approval of investment trust shares as a trust investment. See Loring, Trustee's Handbook (Farr Rev.) § 81. The settlor included in the trust no discretionary power to expend principal for the widow, which would have been a natural provision for him to make if he had intended that she be given more than the normal benefits afforded to a life beneficiary. Beyond these slight indications of the settlor's views, interpretation of the trust instrument seems to us to be of no assistance. See Scott, Trusts (2d ed.) § 236.3, pp. 1819–1821.

2. The usual Massachusetts rule for the allocation of dividends was stated in *Minot* v. *Paine,* 99 Mass. 101, 108, "A trustee needs some plain principle to guide him; and the cestuis que trust ought not to be subjected to the expense of going behind the action of the directors, and investigating the concerns of the corporation, especially if it is out of our jurisdiction. A simple rule is, to regard cash dividends, however large, as income, and stock dividends, however made, as capital." See *Lyman* v. *Pratt,* 183 Mass. 58, 60. This simple rule, in practice, has come to be based in some degree, in certain instances, upon the substance, rather than the form alone, of the transaction as carried out by the entity declaring the dividend. See Newhall, Settlement of Estates (4th ed.) §§ 446–447; Scott, Trusts (2d ed.) §§ 236, 236.3, 236.4, 236.5, 236.7, 236.10, 236.11, 236.14; Bogert, Trusts and Trustees (2d ed.) §§ 846, 850; Loring, Trustee's Handbook (Farr Rev.) §§ 100, 103, 104. See also *Third Natl. Bank & Trust Co.* v. *Campbell,* 336 Mass. 352, 354–355; Flickinger, A Trustee's Nightmare: Allocation of Stock Dividends between Income and Principal, 43 B. U. L. Rev. 199. Dividends in cash in substance paid out of capital or in liquidation have been treated as belonging to principal. See *Heard* v. *Eldredge,* 109 Mass. 258, 260; *Anderson* v. *Bean,* 272 Mass. 432, 441–444. See also Restatement 2d: Trusts, § 236 (e) and (f), and comments *w* and *x*. Cf. *Hemenway* v. *Hemenway,* 181 Mass. 406, 410–411; *Lannin* v. *Buckley,* 256 Mass. 78, 84. The substance of a transac-

tion has been examined to determine whether it was equivalent to a stock dividend. *D'Ooge* v. *Leeds,* 176 Mass. 558, 565. See *Coolidge* v. *Grant,* 251 Mass. 352, 354–355. Cf. *Gray* v. *Hemenway,* 212 Mass. 239, 241–242; *Gray* v. *Hemenway,* 268 Mass. 515, 518–519. Where the trustee, as shareholder, is given the option to receive a dividend in stock or in cash, the later cases, in effect, treat the dividend as a cash dividend and as income. *Smith* v. *Cotting,* 231 Mass. 42, 48–49. See Newhall, Settlement of Estates (4th ed.) § 447, pp. 164–168 (but cf. *Daland* v. *Williams,* 101 Mass. 571, 573–574; *Rand* v. *Hubbell,* 115 Mass. 461, 476–478). See also Restatement 2d: Trusts, § 236 (c) and comment *u;* Scott, Trusts (2d ed.) § 236.4, pp. 1821–1822; Bogert, Trusts and Trustees (2d ed.) § 846. We look at the substance of the capital gain distribution made by Broad Street in December, 1961, against the background of these authorities. No prior Massachusetts case has presented the question whether such a distribution, received by a trustee, is to be treated as capital or income.

Decisions outside of Massachusetts have generally treated such capital gain dividends as income rather than principal. See *Rosenburg* v. *Lombardi,* 222 Md. 346, 350–353; *Briel* v. *Moody,* 77 N. J. Super. 306, 309; *Matter of Byrne,* 192 Misc. (N. Y.) 451; *Matter of Bruce,* 192 Misc. (N. Y.) 523, 527–528;[4] *Lovett Estate* (No. 2), 78 D. & C. (Pa.) 21, 25. See also *Coates* v. *Coates,* 304 S. W. 2d 874, 876 (Mo.); *Matter of Appleby,* 15 Misc. 2d (N. Y.) 200, 204–208. Cf. *Re Whitehead's Will Trusts,* [1959] 1 Ch. 579, 591–592. The Maryland case to a considerable extent (see pp. 349, 353) turns upon "analysis of previous decisions of" that court, not relating to regulated investment companies, holding that "moneys arising from the sale of corporate property . . . and distributed as a cash or stock dividend are income if they arise from a sale of property made by the corporation in the ordinary course of its business, when it sells only

---

[4] For other New York cases, see *Matter of Hurd,* 203 Misc. (N. Y.) 966, 972–973; *Matter of Bailey,* 20 Misc. 2d (N. Y.) 539, 540; *Matter of Snitzer,* 33 Misc. 2d (N. Y.) 692, 694.

such property as it is its regular business to sell.'' The force of the New York cases, as a precedent for out of state guidance, has been somewhat diminished by the recent statutory reversal of the rule announced in those decisions. See N. Y. Sess. Laws, 1963, c. 1005, § 3, effective June 1, 1964.[5] The other cases do not give comprehensive consideration to the novel problems presented by the capital gains distributions of regulated investment companies.

Some commentators have felt that dividends from net capital gains from the sales of securities held in a mutual fund's portfolio are income from the ordinary conduct of the fund's business, that the portfolio holdings are bought and sold like inventory or other corporate property of a business corporation, and that distributions from such gains, at least where there is opportunity to receive the distribution in cash, should be treated as income.[6] Weight is given by these commentators to the circumstance that investors in investment companies rely on both income and capital gains as a part of the expected yield. It is suggested by at least one author (Professor Bogert) that to invest in mutual funds would be a breach of trust, about which the life beneficiary could complain, unless the investment produced a normal trust investment yield. The con-

[5] Section 3, among other things, amends the Personal Property Law, by inserting a new § 17–a, subsection 7 of which reads, ''Distributions made from ordinary income by a regulated investment company . . . are income. All other distributions made by such a company . . . including distributions from capital gains, depreciation or depletion, whether in the form of cash or an option to take new stock or cash or an option to purchase additional shares, are principal.'' This appears to be the same as § 6 (c) of the Revised Uniform Principal and Income Act, promulgated in August, 1962. See Handbook, Natl. Conf. of Commrs. on Unif. State Laws, 1962, pp. 85, 249, 255. Section 6 (e) of the revised uniform act provides that a trustee may rely upon any statement of the distributing corporation concerning the source or character of dividends.

[6] See Bogert, Trusts and Trustees (2d ed.) § 858; Cohan and Dean, Legal, Tax and Accounting Aspects of Fiduciary Apportionment of Stock Proceeds: The Non-Statutory Pennsylvania Rules. 106 U. of P. L. Rev. 157, 181–183; Putney, Capital Gain Dividends, 95 Trusts and Estates 22; Young, A Dissent on Capital Gain Distribution, 88 Trusts and Estates 280, More About Capital Gains, 88 Trusts and Estates 467. Cf. Rogers, Capital Gain Dividends — A Suggestion for Draftsmen, 20 Fordham L. Rev. 79, who proposes meeting the problem by appropriate drafting of trust instruments, see. also 90 Trusts and Estates 300.

trary view[7] is that the sale of a security in an investment company portfolio involves the sale of a capital item, so that, if the gain is distributed the capital is necessarily reduced. In some years such a company may experience net losses. It is argued that if capital gain distributions of other years have been paid to the income beneficiary, the trust principal will inevitably suffer in years of losses, which must be expected even in an era generally inflationary, so that, in effect, the investment company shares may become a wasting investment. It is also urged that a trustee's investment in an investment company is in substance nothing more than a fractional ownership in a diversified portfolio of securities, as to which the trustee should account as if he held the portfolio securities directly. The special character of regulated investment companies and their specialized tax treatment under the Internal Revenue Code[8] also have some tendency to give capital gains distributions the aspect of principal.

If the dividends and distributions of a regulated investment company should be regarded as inherently the same as those of an ordinary industrial company, then the rule of *Smith* v. *Cotting*, 231 Mass. 42, 48–49, should be applied to Broad Street's 1961 capital gain distribution, which the trustees, at their option, could have received either in cash or in shares. It seems to us, however, that, when a fiduciary invests in investment company shares, he is entering

---

[7] Shattuck, Capital Gain Distributions, Principal or Income? 88 Trusts and Estates 160, 429. See discussion of Revised Uniform Principal and Income Act, in which Professor Scott participated, 101 Trusts and Estates 894, 897. He there is quoted as saying that it is unknown whether capital gains distributions of regulated investment companies ''are income or principal under the present [a]ct,'' i.e. the uniform act prior to the 1962 revision (see fn. 5, *supra*), but he went on to say, ''The revised draft has adopted the proper rule.'' See doubts expressed about some of the cases from other jurisdictions cited above, Scott, Trusts (2d ed.) § 236.14 at pp. 1844–1845. The need of a clear rule is obvious. See Loring, Trustee's Handbook (Farr Rev.) § 100, pp. 258–259.

[8] Massachusetts makes special provision for the excise taxation of investment companies. See G. L. c. 63, § 38B (as amended through St. 1956, c. 550, § 8; later amended through St. 1962, c. 756, § 7), and § 42C (as inserted by St. 1962, c. 560, § 2). See also c. 63, § 56A (as amended through St. 1962, c. 560, § 3), and Corp. Exc. Tax Ruling 1956–2, October 23, 1956. See C. C. H. State Tax Reporter, Mass. pars. 10–460 and 10–460.75.

into an arrangement more closely like participation in a common trust fund (see G. L. c. 203A) than like an investment in the shares of an industrial company. His purpose generally will be to obtain for his trust beneficiaries (usually of a small trust) the same type of spread of investment risk which the trustee of a common trust fund can obtain for its participating trusts, or which the trustee of a large trust fund can obtain by a well conceived program of diversified direct investment.[9]

The arguments against the soundness of the analogy between investments in mutual funds and in a common trust fund (see e.g. Bogert, Trusts and Trustees [2d ed.] § 858, pp. 557–558, and The Revised Uniform Principal and Income Act, 38 Notre Dame Lawyer 50, 54–55) are to us unconvincing. It may be a sound reason for a trustee to refrain from investing in investment company shares that the return from dividends paid from ordinary income of such companies is low, so that the life beneficiary will suffer unless he receives also the capital gain distributions. It may be also that appropriate downward adjustment in the rate of trustee's fees should be made, if he invests substantially in investment company shares (because he is not burdened with investment management), with the consequence that the income return to the life beneficiary will be improved pro tanto. See discussion in Scott, Trusts (2d ed.) § 227.9A; Bogert, Trusts and Trustees (2d ed.) § 679, pp. 311–313. These matters we need not determine. The possible meager return does not change the substance of the investment as a reasonable attempt at risk diversification similar to that of the common trust fund. To say that the realized gains of a common trust fund are not distributed to the participating trust, whereas those of an investment company are distributed (primarily for tax rea-

[9] Broad Street as of December 31, 1962, is reported by a standard manual to have had $249,079,948, invested in the common shares of 99 companies, in the preferred shares of seven companies, and in the bonds of twenty-four companies, plus some government bonds. See Wiesenberger, Investment Companies (1963 ed.) part 5, p. 12. Such an investment diversification could not possibly be directly achieved by any trustee unless the trust res was extraordinarily large.

sons) to fiduciaries who are shareholders, is merely to state the obvious fact that a common trust is administered by the trustee itself, whereas the regulated investment company is a separate entity from the trustee who invests in its shares. If a trustee elects to take shares of the investment company in payment of any distribution made to him of capital gains, he will be able to achieve the same substantive result as that achieved by the common trust fund.

The method of determining the purchase and sale prices of investment company shares (fn. 3, *supra*), in relation to the net asset value of shares, is consistent with the concept that the trustee is obtaining diversification by an indirect participation in the investment company's portfolio. It is apparent that if a fiduciary were to redeem his shares at a profit just before a capital gain distribution, he would necessarily allocate any gain to principal. No practical reason requires treating the capital gain distribution, when made, in any different way, or prevents retaining it as a part of the principal of the trust.

One major virtue of our Massachusetts rule for allocation between principal and income has been its simplicity as a rule of convenience. See *Minot* v. *Paine*, 99 Mass. 101, 108; *Third Natl. Bank & Trust Co.* v. *Campbell*, 336 Mass. 352, 354–355. To treat capital gains distributions of regulated investment companies as principal will not impair the simplicity of our rule, for no inquiry need be made as to the source of the distribution. The source must be announced,[10] as it was in respect of Broad Street's capital gain distribution in December, 1961.

Since no binding precedent controls our decision, we are guided by the substance of the situation. We adopt the

---

[10] Section 19 of the Investment Company Act of 1940, 15 U. S. C. § 80a–19 (1958), makes it unlawful for any registered investment company to make any distribution from any source other than — " (1) such company's accumulated undistributed net income, determined in accordance with good accounting practice *and not including profits or losses realized upon the sale of securities or other properties;* or (2) such company's net income *so determined* for the current or preceding fiscal year; unless such payment is accompanied by a written statement which adequately discloses the *source* . . . of such payment . . .'' (emphasis supplied).

rule that distributions by a regulated investment company, from capital gains (whether made in the form of cash or shares or an option to take or purchase new shares), are to be allocated to principal. This is essentially the view adopted by the Commissioners on Uniform State Laws in 1962 after full deliberation (see fn. 5, *supra*). The Commissioners' action can be taken as reflecting a considered current view of what is in the public interest.[11] In effect, we think that the regulated company, from the standpoint of a trustee investing in its shares, is merely a conduit of its realized gains to the trust fund and that, in the hands of the trustee, the gains should retain their character as principal.

3. A decree is to be entered in the Probate Court (a) that the distribution of capital gains by Broad Street in December, 1961, in the hands of the trustees of the settlor's trust is to be treated as principal and not as income, and (b) that future similar distributions to the trustees of capital gains by Broad Street also are to be allocated to principal. Costs and expenses of this appeal are to be in the discretion of the Probate Court.

*So ordered.*

[11] Because there has been reasonable doubt until this decision of what our rule was, it is probable that trustees' allocations in good faith of such distributions to income, if already completed, cannot fairly be said to have been improper or to constitute a breach of trust. It is not necessary for us to decide this question on this record.