Estate of Phyllis W. McGillicuddy, John T. McGillicuddy, Executor, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 3032–67.   Filed February 17, 1970.

*Chester M. Howe*, for the petitioner.
*Robert B. Dugan*, for the respondent.

OPINION

Respondent determined that the value of the charitable remainder of the Phyllis W. McGillicuddy Charitable Trust was not ascertainable at the date of decedent's death and therefore disallowed a charitable deduction to her estate.

In computing the value of the taxable estate, section 2055 [1] provides for a deduction from the gross estate for the value of bequests, legacies, devises, or transfers exclusively for charitable purposes. The regulations under section 2055 provide further that when a trust is created for both a charitable and a private purpose no deduction for the value of the charitable interest shall be allowed unless that "interest is presently ascertainable, and hence severable from the noncharitable interest." Sec. 20.2055–2, Estate Tax Regs.; see *Merchants Banks* v. *Commissioner*, 320 U.S. 256 (1943). Accordingly, when the remainder interest of an estate is transferred in trust, as in the present case, and left for charitable purposes following an intervening life estate, a charitable deduction is allowed to the estate in computing its taxable estate only if the value of the interest passing to the charity is presently ascertainable at the date of death of the decedent. See *Henslee* v. *Union Planters Bank*, 335 U.S. 595 (1949).

Respondent's position is threefold:

(1) That under the terms of the trust the trustees may invest in shares of regulated investment companies and distribute capital gains to the life tenant. Thus, respondent contends that the said trustees may divert corpus from, and therefore prevent ascertainment of the value of the charitable remainder in accordance with established rules. [2]

[1] All statutory references herein are to the Internal Revenue Code of 1954, unless otherwise indicated.

[2] For a good exposition of the problem see Note. "Charitable Remainders and the Federal Estate Tax Charitable Deduction," 40 Temp. L. Q. 102 (1966) especially 109:

"Revenue Ruling 60–385 [25] provides that a charitable remainder is unascertainable if a trustee is empowered either by the will or state law to invest trust funds in shares of mutual fund or regulated investment companies and to allocate to income the capital gain dividends paid by such companies. The conclusion upon which Revenue Ruling 60–385 is based is that the exercise of the powers to invest in mutual fund shares and allocate the capital gain dividends to income constitutes a diversion of corpus. For this reason, the charitable deduction is denied by Revenue Ruling 60–385 where such powers exist.

"Whether or not the allocation of mutual fund capital gain dividends to income diverts corpus, for purposes of the ascertainability requirement, depends upon whether the capital gain dividends are classified as income or principal. Once the capital gain dividends are classified as income or principal, all the attributes of that classification will follow. It cannot logically be concluded, therefore, that the allocation of capital gain dividends to income constitutes a diversion of corpus, unless it is first established that capital gain dividends belong to corpus. If the dividends are classified as income, no diversion of corpus can be thought to take place. Revenue Ruling 60–385, however, is based upon the theory that capital gain dividends are principal. It follows that where a will or state law permits their allocation to income, there is a diversion of corpus, unascertainability, and hence no charitable deduction.

"The reality behind the denial of the deduction in Revenue Ruling 60–385 is that there is more than a remote possibility that in some years the mutual fund company will sustain a net capital loss. The date of death value of the trust's investments will diminish each year there is a net capital loss and will not be restored if the gains from profitable years are distributed to the income beneficiary. The mutual fund investment is thus akin to a wasting asset. The effect of having gains distributed to the life tenant and losses borne by the remainderman is a depletion of corpus in a manner that cannot be computed. Since there is no way of computing with any degree of certainty, the number of years and the amounts in which the mutual fund company will sustain a net capital loss, the amount of the remainder interest that will eventually be distributed to charity is said to be unascertainable. For this reason, it is thought that a charitable bequest does not fulfill the ascertainability requirement of the Regulations when the trustee can invest in mutual funds and allocate the capital gain dividends to income. [Footnote omitted.]"

(2) That under the terms of trust the trustees are also authorized to invest in real or personal property, "whether or not the same shall be or become unproductive" and the trustees are further authorized—

to determine all questions as between income and principal and to credit or charge to income or principal or to apportion between them any receipt or gain and any charge, disbursement or loss as is deemed advisable in the circumstances of each case as it arises, notwithstanding any statute or rule of law for distinguishing income from principal or any determination of the courts;

and thus could, under these provisions, properly make distributions to the life tenant which would be contra to conventional rules but which would not be an abuse of discretion under the terms of the governing instrument.

(3) That since the parties have stipulated that the trust income alone is not sufficient to support the life tenant in his accustomed manner if his other resources are disregarded, respondent concludes that, under the terms of the trust, the trustees may disregard the life tenant's other resources in providing for his maintenance and support, and invade principal.

Respondent argues in conclusion that the remainder interest is unascertainable under any one of the above three provisions, and that the combined effect of all three makes it clear that the charitable deduction cannot be allowed.

As is often the case, in questions dealing with property rights, we look to the law of the jurisdiction involved. See, e.g., *Estate of Florence H. Lawler*, 52 T.C. 268 (1969).

In *Tait v. Peck*, 346 Mass. 521, 194 N.E. 2d 707 (1963), the Supreme Judicial Court of Massachusetts, on considering a December 1961 distribution, adopted the rule that distributions from capital gains by a regulated investment company, whether in cash, or shares, or an option to take or purchase new shares, were to be allocated to principal. The rationale for the rule adopted in *Tait* was "that the regulated investment company, from the standpoint of the trustee investing in its shares, [was] merely a conduit of its realized gains to the trust fund and that in the hands of the trustee, the gains should retain their character as principal." Accord, *In re Estate of Brock*, 420 Pa. 454, 218 A. 2d 281 (1966) ; and see generally Note, "Charitable Remainders and the Federal Estate Tax Charitable Deduction," 40 Temp. L.Q. 102 (1966).

Respondent argues on brief that, regardless of the decision of *Tait v. Peck, supra*, the trustees under the authority granted in the governing instrument may in their discretion allocate capital gains to the life tenant. The keystone of respondent's argument on both this point and his second contention is the decision of *Dumaine v. Dumaine*, 301 Mass. 214, 16 N.E. 2d 625 (1938). In *Dumaine* the plaintiff, in his capacity as

sole trustee, sought instructions regarding his powers under the following clause (301 Mass. at 215, 16 N.E. 2d at 626) :

"The trustee under this instrument shall have full power and discretion to determine whether any money or other property received by him is principal or income without being answerable to any person for the manner in which he shall exercise that discretion."

The petition was amended so that additional instructions could be obtained as to whether the plaintiff could in his discretion distribute the profit from the sale of certain shares of stock to himself as a life tenant.

The court in *Dumaine* (301 Mass. at 224, 16 N.E. 2d at 630) held:

Upon consideration of the entire matter, we are of the opinion that the trustee under the clause in question has full power and discretion, after serious and responsible consideration, short of arbitrary or dishonest conduct or bad faith, or fraud, when he has to determine whether any money or other property received by him is principal or income, and that upon this record there is nothing disclosed to prevent him from distributing to himself, in his personal capacity, the profit derived during the year 1938 as the result of selling certain shares of stock, a part of the trust property, at a price "over and above cost."

As a result of the above holding and equivocal language in *Dumaine* itself a wake of uncertainty developed over the extent of a trustee's discretion and accountability. See *State Street Trust Co.* v. *United States*, 263 F. 2d 635, 639 (majority opinion), 640–642 (dissenting opinion) (1959) ; *Boston Safe Deposit & Trust Co.* v. *Stone*, 348 Mass. 345, 351, fn. 8, 203 N.E. 2d 547, 552 (1965).

Finally, almost three decades after *Dumaine*, the Supreme Judicial Court of Massachusetts in *Old Colony Trust Co.* v. *Silliman*, 352 Mass. 6, 223 N.E. 2d 504 (1967), reexamined *Dumaine* and restricted its purported application. In *Silliman*, the will of the decedent set up a charitable trust with an intervening life estate. The executors and trustee sought instructions on the following power contained in the trust: "My said trustee may decide whether accretions to the trust property shall be treated as principal or income and whether expenses shall be charged to principal or income."

Speaking for the court, Justice Whittemore stated (*Old Colony Trust Co.* v. *Silliman, supra* at 9–10, 223 N.E. 2d at 507–508) :

Article II G1 is not a grant of "absolute" or "uncontrolled" discretion. The instrument does not in terms substitute the decision of the trustee for usual and understood rules applicable to fiduciaries. The intention of the instrument as a whole (see *Dumaine* v. *Dumaine* * * *) is that the entire principal of the trust go eventually to charity. This intent will not be effectuated if the trustee can substitute for established rules its decision made in good faith as to what to do as between principal and income. The *Dumaine* decision * * * may heretofore have been thought to authorize such substitution where the trust provided that the trustee had "absolute and uncontrolled discretion" and was subject to no liability except for "his own dishonesty or gross negligence." We affirm the

statement in the *Stone* case (348 Mass. 345, 351, 203 N.E. 2d 547) that even very broad discretionary powers are to be exercised in accordance with fiduciary standards and with reasonable regard for usual fiduciary principles. Such reasonable regard means that established rules will be applied. We are not concerned with the possible effect of Article II G1 as an exculpatory clause. That this may be one of the purposes of the article, with the effect of exempting the trustee from liability for error in applying such rules, does not make less certain the dispositive intent and effect of the will. An intention that deviation "from the principal-income law * * * [not be deemed] an abuse of discretion" (Proceedings of the American Bar Association, Section of Real Property, Probate and Trust Law, August 9–11, 1965, p. 190) does not, we think, necessarily show an intent that the trustee, in the proper administration of the trust, shall be free at his discretion to depart from the usual well understood rules. Compare Scott, Trusts (2d ed.) sec. 233.5. See Bogert, Trusts and Trustees, sec. 816.

We think the grant of power to "decide whether accretions" are to be treated as principal or income and how expenses are to be charged, apart from its possible exculpatory effect, is primarily an administrative power authorizing the trustee in instances of doubt to use its best informed judgment in good faith in the light of what the established rules suggest to the trustee is consistent therewith. This is a means of avoiding the expense of litigation. *This power may not be used to shift beneficial interests. It does not authorize favoring either the charitable or the private beneficiaries.* It is of equal advantage to each in conserving the assets of the trust. In our view such a power imports no more uncertainty in the ascertainment and calculations of the value of the charitable remainders than does the contingency that the precise amount of administrative charges and of accretions over the years cannot be known in advance. The trustee and the executors, applying the known and established rules in respect of the allocations referred to in Article II G1, are under a duty to compute present values of charitable remainders exactly as they would under a trust that does not include an express statement of the power in the trustee to determine the allocations. [Emphasis supplied.]

Also cf. *Estate of Lillie MacMunn Stewart*, 52 T.C. 830 (1969).

We deem it proper to adopt and follow the rationale of *Silliman*, for in the instant case "the underlying substantive rule involved is based on State law and the State's highest court is the best authority on its own law." *Commissioner* v. *Estate of Bosch*, 387 U.S. 456, 465 (1967).

We believe that the intent of the trust instrument as a whole in the instant case was identical to that of the instrument in *Silliman*, viz, that the entire principal of the trust was to go to charity. Moreover, after a careful examination of the powers contained in subparagraph 10 of paragraph Seventh of the trust, we conclude that they were similar, if not narrower than the powers in *Silliman*. (We observe that in the instant case subparagraph 10 of paragraph Seventh empowers the trustee "to determine all *questions* as between income and principal." (Emphasis supplied.)) Furthermore, we believe that the meaning of the clause in the instant trust, "notwithstanding any statute or rule of law for distinguishing income from principal or any determination of the courts," is merely exculpatory, "authorizing the trustee in instances of doubt to use [his] best informed judgment in good

faith." Cf. *Briggs* v. *Crowley*, 352 Mass. 194, 200, 224 N.E. 2d 417, 421 (1967). We base this decision, *inter alia*, on the statement by the court in *Dumaine* (301 Mass. at 222, 16 N.E. 2d at 629) that the—

power, if uncontrollable, to determine whether any money or other property received by the trustee is principal or income, coupled with the power to pay over to the present life tenant so much of the net income as in his absolute and uncontrolled discretion he shall determine, would give the trustee power to destroy the trust,

on the eleventh paragraph of the trust instrument itself wherein it states: "ELEVENTH: The provisions of this instrument shall be interpreted in accordance with the laws of the Commonwealth of Massachusetts;" and on the decision in *Silliman*.

Accordingly, we find and hold that the trustee's powers to invest in regulated investment companies and of allocation, did not under the law of Massachusetts grant such powers so as to render the value of the remainder interest unascertainable. In addition, we find and hold for the same reasons that the beneficial interests in the instant case could not be shifted by the powers granted in paragraph Seventh of the trust so as to render the value of the remainder interest unascertainable. *Old Coloney Trust Co.* v. *Siliman*, *supra*; *Briggs* v. *Crowley*, *supra*.

Respondent's third and final contention is that even though the parties have stipulated that the other resources available to the life tenant are adequate for this support and maintenance, yet the trustees under paragraph Fourth of the trust may disregard his other resources in exercising their discretion as to whether or not payments out of principal are necessary for his "maintenance or support." Respondent argues that as a result the corpus will be subject to invasions, thus making the value of the remainder interest unascertainable.[3]

At the outset petitioner on brief contends that respondent's third contention is not properly before the court. Petitioner asserts that the pertinent portion of the deficiency notice (reproduced in our findings) failed to raise this issue. We disagree.

We observe that the purpose of a deficiency notice is to provide a formal notification that a deficiency in taxes has been determined. *Manuel D. Mayerson*, 47 T.C. 340, 349 (1966). In this vein the object is to prevent surprise and an inadequate notice. Cf. *William B. Swope*, 51 T.C. 442, 452 (1968).

The deficiency notice in the instant case is not entirely definitive in outlining why the value of the remainder interest was unascertainable, but it does state that this is so "within the meaning of [regulations]

[3] Since the parties have also stipulated that the income from the trust is not adequate for John's support if his other resources are disregarded, and we cannot determine the extent of such inadequacy from the record, respondent's conclusion is inescapable if his premise is accepted.

Section 20.2055–2 (a)." This regulation provides that if a trust serves both a charitable and a private purpose, a deduction is allowable only insofar as the charitable interest is presently ascertainable. This is sufficiently broad, and entirely adequate to include the argument which respondent now makes. Even if this were not so, it is possible for respondent to advance one theory in his deficiency notice, yet not be restricted to such theory in his defense of a petition to this Court, there being no surprise. *Standard Oil Co.*, 43 B.T.A. 973, 998 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942). Moreover, at trial petitioner testified and put exhibits into evidence on this precise issue. Obviously petitioner was well aware of the scope of respondent's deficiency notice and we hold that the burden of proof remains on petitioner.

The question posed is purely one of interpretation of the trust in order to determine the intent of the settlor when she provided that the trustees should pay the net income to John during his life and in addition should pay to him, or for his benefit, amounts of principal "as the trustees in their sole discretion determined necessary for his maintenance or support."

Was it the intent of Phyllis that the trustees should or should not consider John's own resources in determining whether or not invasions of principal were necessary for his maintenance or support?

The language of the trust itself ("in the light of the circumstances attending its execution") is, of course, the most important element in the determination of the settlor's intent. *Jewett* v. *Brown*, 319 Mass. 243, 65 N.E. 2d 307 (1946), and cases cited therein. We find that the highest court of Massachusetts has spoken clearly on the interpretation of provisions such as the one which now concerns us.

*Holyoke National Bank* v. *Wilson*, 214 N.E. 2d 42, 45–46 (Mass. 1966), stated the rule as follows:

Whether or not a beneficiary's separate resources are to be considered is a question of interpretation. * * * Thus, in certain instances, we have held that amounts for the support of a beneficiary were properly determined without reference to the beneficiary's separate property. * * * [Citing cases]. But where there is language manifesting a contrary intention, the usual case being where a trustee's discretion to pay is qualified by such words as "[when] in need" or "if necessary," we have reached the opposite result.* * * [Citing cases]. For a good discussion of this distinction, see Hoops v. Stephan, 131 Conn. 138, 38 A. 2d 588.

The discussion of the distinction of *Hoops* v. *Stephan* is very clearly put. It reads (38 A. 2d 588, 591–592) :

The primary question in this class of cases always is, Does the will constitute an absolute gift of support and maintenance which it makes a charge upon the income from the estate and upon principal? If, so, then the private income of the beneficiary cannot be considered. If, however, the gift is of income coupled with a provision that the principal may be invaded in case of need, the private income of the beneficiary must be considered in determining whether such need exists.

In the instant case the provision of paragraph Fourth of the trust is not that income and principal if necessary be expended for John's maintenance or support but is an absolute direction that all of the net income go to John during his life and "in addition" that invasions of principal may be made as determined necessary by the trustees for John's maintenance or support. Thus the language is squarely within the distinction as drawn in *Hoops* and must be interpreted as directing invasions of corpus on consideration of John's need and necessity in the light of his own resources as is indicated in *Holyoke*. Massachusetts cases holding that the determination of the need or the necessity of the life tenant is to be made without consideration having been given to his separate property or resources are cases in which income from the fund as well as the fund itself is charged for the necessary support or maintenance. See, e.g., *Crocker* v. *Crocker*, 11 Pick. 252; *Hills* v. *Putnam*, 152 Mass. 123, 25 N.E. 40; *Burnett* v. *Williams*, 323 Mass. 517, 83 N.E. 2d 6.

Our conclusion that Phyllis intended for her trustees to consider John's own resources when exercising their discretion as to invasions of principal is strengthened by other factors. They had been married and had lived together for about 30 years. John had been and was a highly successful businessman having been president of National Casket Co. for approximately 3 years prior to his wife's death, and vice president of that company for 20 years before that. National is the largest company in its industry and John's annual compensation, and his estimated benefits upon retirement of over $11,000 per annum are set out in our findings.

It is only reasonable to assume that Phyllis knew the approximate extent of John's estate, of his earnings, and potential future earnings and income when she created this trust, and knew that in all probability no part of the corpus of the trust would ever be necessary for his support or maintenance. This is especially true when it is considered that in addition to John's separate resources there would be added the income from her trust (of almost $300,000). With this knowledge she designated her trust as "The Phyllis McGillicuddy Charitable Trust," which in itself is a strong indication of her intent.

Examination of such material circumstances of the parties at the time of the execution of the trust, and pertinent facts within their knowledge, are valuable aids in construing intent as manifested by the words used in the instrument itself. *Jewett* v. *Brown, supra; Spalding* v. *Morse*, 76 N.E. 2d 137, 139 (Mass. 1947), and cases cited therein.

A further circumstance supporting our conclusion is that Phyllis' will and trust are obviously drawn to take full legal advantage of the marital deduction and other tax-saving plans. In *State Tax Com-*

*mission* v. *Loring*, 215 N.E. 2d 751 (Mass. 1966), a similar circumstance was considered and the court said at page 754:

The accomplishment of identifiable tax objectives of this character frequently may be an aid to the interpretation of trust instruments (see e.g. New England Trust Co. v. Faxon, 343 Mass. 273, 276, n. 3, 178 N.E. 2d 488), and, so far as may be reasonably consistent with the language of the instrument and applicable legal principles, we should give effect to the intention, thus disclosed, of the party or parties to the instrument.

We feel that the charitable remainder was just such an identifiable tax objective in the instant case and that it thus supports our interpretation of the trust under consideration.

It follows from all of the above that the charitable remainder interest was ascertainable, and hence deductible.

*Decision will be entered under Rule 50*