THE ESTATE OF HARRY H. BECKWITH, DECEASED, EDWARD P. BROWN AND ADA C. SYMES, EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1545–69.    Filed October 29, 1970.

*Chester M. Howe* and *William L. May, Jr.*, for the petitioners. *Robert B. Dugan*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal estate tax in the amount of 69,837.31. The only issue presented for decision is whether the assets of the Harry H. Beckwith Trusts are includable in the decedent's gross estate under section 2036 (a),[1] as a transfer with a retained life estate.

### FINDINGS OF FACT

Edward P. Brown and Ada C. Symes, petitioners herein, are coexecutors of the Estate of Harry H. Beckwith, who died October 5, 1964. Both petitioners were legal residents of Boston, Mass., at the time the petition was filed. They filed a Federal estate tax return with the district director of internal revenue, Boston, Mass.

In 1904, Harry H. Beckwith (hereinafter referred to as Harry or the decedent) organized a company to manufacture box toes for shoes. Through a merger of that company with another in 1955, he created Beckwith-Arden, Inc. (hereinafter Beckwith-Arden). Beckwith-Arden prospered and expanded its business so that by 1964 it was the parent company in a corporate structure which included five subsidiaries.

Harry had a forceful and dynamic personality, and he remained active in the daily operations of Beckwith-Arden until the date of his death. He was unanimously elected to the board of directors in each year from 1955 until his death in 1964, and he served as president of the corporation during that period. Prior to the 1955 merger, with the exception of a short period during the 1930's, he served as the chief executive officer of both of the original companies.

On December 18, 1957, Harry created irrevocable trusts, The Harry H. Beckwith Trusts, naming Robert A. Ball and Second Bank-State Street Trust Co. as cotrustees. The pertinent provisions of the trust instrument are as follows:

FOURTH: The property of each trust pertaining to an adult beneficiary shall be disposed of as follows:

(a) During such beneficiary's life, or until said trust shall be sooner terminated as provided in article SIXTH hereof, the trustees shall pay to or apply for the benefit of such beneficiary, the net income thereof, at least quarterly.

\* \* \* \* \* \* \*

FIFTH: The property of each trust pertaining to a minor beneficiary shall be disposed of as follows:

(a) During such beneficiary's minority, or until said trust shall be sooner terminated as provided in article SIXTH hereof, the trustee shall pay to or apply for the benefit of such beneficiary, such amounts of the net income and principal thereof as the trustees from time to time deem advisable. Accumulated income may, in the trustees' discretion, be added to principal or distributed from time to time as current income.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

(b) Upon such beneficiary's death, if said trust shall not have been sooner terminated as provided in article SIXTH hereof, both principal and undistributed income thereof, as then constituted, shall be distributed, free of trust, to the legal representative of such beneficiary's estate.

SIXTH: If not sooner terminated by the death of the beneficiary, each trust pertaining to an adult beneficiary shall terminate on October 1, 1972, and each trust pertaining to a minor beneficiary shall terminate when such beneficiary reaches the age of twenty-one years. Thereupon, the property of each trust shall be distributed, free of trust, to the beneficiary to whom said trust pertains.

\*     \*     \*     \*     \*     \*     \*

ELEVENTH: * * * the trustees shall have the following powers * * *:

1. To retain for any period of time and, in their sole discretion, to purchase or sell any securities or property, although of a kind or amount which ordinarily would not be considered suitable for a trust investment, even to the extent of keeping the whole or any portion of the trust fund invested in the securities or shares of Beckwith-Arden, Inc., a New Hampshire corporation, or any of its subsidiaries, or any successor to the business of any one or more of them; * * *

\*     \*     \*     \*     \*     \*     \*

TWELFTH: There shall be no more than two trustees and at least one of them or the trustee, if there is only one, shall be a bank or trust company authorized by law to conduct a fiduciary business in The Commonwealth of Massachusetts. Subject to that requirement, the donor may, in his lifetime and at his pleasure, remove any trustee and appoint a successor trustee, other than the donor, to fill any vacancy.

So long as there shall be an individual trustee hereunder, such individual trustee shall have sole authority to determine in what manner the trust property shall be invested and to vote or act in respect to all shares or securities held in trust hereunder, and, during that period, the corporate trustee shall have no such authority or duty and shall not be liable for any loss resulting therefrom.

A vacancy in the office of the individual trustee, which occurs after the donor's death, shall not be filled and the corporate trustee shall thereafter be the sole trustee.

\*     \*     \*     \*     \*     \*     \*

Any trustee succeeding a trustee hereunder shall thereupon become vested with title to the trust property with all the powers conferred hereunder upon such trustee without the necessity of other instruments. * * * A trustee may, by an instrument in writing and signed by him, delegate all or any of his powers and discretion to a cotrustee, except that the individual trustee may not so delegate his sole authority in respect to investment of the trust property. * * *

Also, on December 18, 1957, the decedent created another trust, the Crotched Mountain Trust. In that declaration of trust is a provision similar to paragraph Twelfth of the instrument creating the Harry H. Beckwith Trusts, giving one of the two cotrustees exclusive authority to invest the trust corpus and to vote or act in respect to all shares or securities held by the trust. This provision was inserted in the declarations of trust at the specific request of the decedent. In each of the trust instruments the trustee originally given authority to invest the corpus was Robert A. Ball.

Robert A. Ball was a director, controller, and vice president of a wholly owned subsidiary of Beckwith-Arden, as well as a director and vice president of Beckwith-Arden. Upon his death in 1958, he was replaced as trustee by Edward P. Brown, who was Harry's personal attorney and the attorney for one of Beckwith-Arden's subsidiaries.

Between 1929 and 1935, Harry had created three other trusts for his children. From 1955 until after Harry's death, Ada C. Symes served as the sole trustee for each of these trusts. She was Harry's personal secretary, and was also the treasurer of one of Beckwith-Arden's subsidiaries.

In 1963, Harry created the Harry H. Beckwith Family Trust, naming himself and Ada C. Symes as cotrustees; he retained the power to revoke these trusts at any time. In addition, Harry and John P. Carr, corporate counsel of Beckwith-Arden from 1935 through 1965, were cotrustees of two trusts created under the will of Harry's wife.

These various trusts held stock in Beckwith-Arden as of May 22, 1964, as follows:

| Shareholder | Number of shares |
|---|---|
| Harry H. Beckwith Trusts—Edward P. Brown, and Second Bank–State Street Trust Co., Trustees | 18,792 |
| Crotched Mountain Trust—Edward P. Brown and Harry C. Gregg, Trustees | 4,100 |
| Ada C. Symes, Trustee for Edwin L. Beckwith | 8,500 |
| Ada C. Symes, Trustee for Isabel B. Closson | 8,500 |
| Ada C. Symes, Trustee for Fred N. Beckwith | 1,000 |
| Harry H. Beckwith Family Trust—Harry H. Beckwith and Ada C. Symes, Trustees | 22,722 |
| Harry H. Beckwith and John P. Carr, Trustees for Edwin L. Beckwith | 8,100 |
| Harry H. Beckwith and John P. Carr, Trustees for Isabel B. Closson | 8,100 |

The total number of shares held by these trusts, 79,814, represents about 76 percent of the 104,650 outstanding shares of Beckwith-Arden's stock.

Harry owned no stock in his individual capacity at the time of his death. However, he had a legal right, as trustee under his wife's will and as trustee of the revocable trust which he had created, to vote 38,922 shares, about 37 percent of the number outstanding. In addition, Edward P. Brown, John P. Carr, and Ada C. Symes, as trustees of the other trusts mentioned above, annually executed proxies made out to either Harry or Delwyn G. Main, a director, vice president, controller, and corporate clerk of Beckwith-Arden, which were actually voted by Harry.

There were no express or implied agreements with respect to any of the trusts which would restrict the trustees' freedom either in voting the Beckwith-Arden stock or in disposing of it.

Between 1957 and 1964 the board of directors of Beckwith-Arden consisted of six members. The names of all the individuals who served as directors during this period, together with their relationship, if any, to Harry, and the positions, if any, which they held with the corporation are as follows:

| Director | Position |
|---|---|
| Harry H. Beckwith | President. |
| Robert A. Ball | Vice president of a subsidiary. |
| Walter H. Heaton | Vice president and general manager of a subsidiary. |
| Emma J. Hall | Treasurer of Beckwith-Arden. |
| Edwin L. Beckwith (son) | Vice president of a subsidiary. |
| Harold J. Eldridge | General Manager of Beckwith-Arden, Inc. |
| Delwyn G. Main | Vice president, controller, and clerk, Beckwith-Arden, Inc. |
| Addison W. Closson, Jr (grandson) | |
| Harry L. Beckwith (grandson). | |
| Edward P. Brown | Harry's attorney. |

During the period from 1960 through 1965, Beckwith-Arden paid substantial dividends on its stock even though it was suffering net operating losses. After careful consideration, this policy was concurred in by all the directors. A similar policy of paying dividends, despite the fact that losses were being suffered, had been followed during the years 1930–34. The dividend record for the period 1959–66 is as follows:

| Year | Sales | Net profit | Surplus | Dividend declared per share |
|---|---|---|---|---|
| 1959 | $5,591,218 | $81,867 | $1,188,656 | $1.00 |
| 1960 | 5,468,100 | 21,997 | 1,101,653 | 1.00 |
| 1961 | 4,983,402 | (64,771) | 927,882 | 1.00 |
| 1962 | 5,292,100 | 99,588 | 918,470 | 1.00 |
| 1963 | 4,229,607 | (55,044) | 756,726 | 1.00 |
| 1964 [1] | 4,443,517 | (569) | 753,223 | 0.25 |
| 1965 | 4,488,504 | (82,510) | 818,991 | 0.25 |
| 1966 | 5,043,178 | 11,392 | 830,383 | 0 |

[1] Harry died in October of this year.

In the notice of deficiency respondent determined that the value of the assets of the Harry H. Beckwith Trusts were includable in Harry's estate under section 2036, "since [he] retained for his life [the] right to designate the persons who shall enjoy the income therefrom."

## OPINION

To support the inclusion of the value of the property transferred to the Harry H. Beckwith Trusts in decedent's gross estate, respondent

relies upon section 2036(a).[2] His principal argument is that the decedent retained the right "to designate the persons who shall possess or enjoy the property or the income therefrom" within the meaning of section 2036(a)(2). He also contends that petitioner retained "possession or enjoyment" of the transferred property within the meaning of section 2036(a)(1).

The broad provisions of section 2036(a) reflect a "legislative policy of subjecting to tax all property which has been the subject of an incomplete *inter vivos* transfer." *United States* v. *O'Malley*, 383 U.S. 627, 631 (1966); cf. *Comm'r*. v. *Estate of Church*, 335 U.S. 632, 644–645 (1949). The policy is to include in a decedent's gross estate transfers that are "essentially testamentary—i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." *United States* v. *Estate of Grace*, 395 U.S. 316, 320 (1969). The statute applies not only where the reservation of rights or control over the property is expressed in the instrument of transfer but also where the right is retained in connection with, or as an incident to, the transfer. Cf. *McNichol's Estate* v. *Commissioner*, 265 F. 2d 667 (C.A. 3, 1959), affirming 29 T.C. 1179 (1958), certiorari denied 361 U.S. 829 (1959).

Section 2036(a)(2) requires property transferred to a trust to be included in the gross estate where the settlor retains the right, alone or in conjunction with another person, to accumulate or to distribute the trust income. *United States* v. *O'Malley, supra; Industrial Trust Co.* v. *Commissioner*, 165 F. 2d 142 (C.A. 1, 1947), affirming in part and reversing in part *Estate of Milton J. Budlong*, 7 T.C. 756 (1946). But this is true only where the decedent has "retained" such a right, i.e., has not surrendered the right. *Helvering* v. *Mercantile-Commerce Bank & Trust Co.*, 111 F. 2d 224 (C.A. 8, 1940), reversing on other grounds *Estate of Paul F. Donnelly*, 38 B.T.A. 1234 (1938), certiorari denied 310 U.S. 654 (1940). The section does not require the inclusion where the right is conferred by a third party. *White* v. *Poor*, 296 U.S. 98 (1935); *Fabian* v. *United States*, 127 F. Supp. 726 (D.Conn. 1954). This does not mean that the applicability of the section depends upon the express reservation of a legally enforceable right, but it suggests the need for prearrangement, or at least an informal agreement or

---

[2] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or
(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

understanding, under which the right is retained. See *Skinner's Estate* v. *United States*, 197 F. Supp. 726, 729 (E.D. Pa. 1961), affd. 316 F. 2d 517 (C.A. 3, 1963).

In the instant case, paragraph Fourth of the trust instrument, quoted in our Findings, explicitly provides for the periodic distribution of trust income to named beneficiaries. Quite clearly, under the terms of this provision the decedent retained no power or right to control the amounts or the timing of such distributions. Respondent recognizes this to be true, but relies upon certain "practical considerations" which, he contends, enabled the decedent to control the flow of the income to the trust by setting the dividend policy of Beckwith-Arden, the closely held corporation whose stock was the subject of the transfer. In this manner, respondent contends, the decedent could determine whether the income would be distributed in the form of periodic payments or in the form of swollen stock values, and could thereby designate the persons who would enjoy the trust income within the meaning of section 2036(a)(2).

The so-called practical considerations on which respondent relies include: The authority for the trust to retain its investment in the closely held Beckwith-Arden stock; the power given the individual trustee to control investments and to vote all trust stock; the decedent's retained right during "his lifetime and at his pleasure, [to] remove any trustee and appoint a successor trustee, other than [himself], to fill any vacancy"; and the close business relationships between the decedent, a forceful personality, and the individual trustees.

For several reasons we do not think these factors, considered either separately or in combination, show that the decedent retained the right to control Beckwith-Arden's dividend policy; nor do we believe that these factors show that the decedent retained the right to designate who was to receive the income from the transferred stock.

First, at the time of his death, the decedent personally owned no stock whatever in Beckwith-Arden. As trustee under the revocable trust which he had created, he had the right to vote 22 percent of the stock; also, as trustee under the trust which his wife had created, he could vote 15 percent—a total of 37 percent. He was able to vote another 39 percent of the stock, including the stock here in controversy, but only under rights conferred on him by annually granted proxies.[3] Even if the decedent's obligations as trustee permit the stock which

---

[3] That the proxies were granted annually is inferred from the testimony, and the inference is consistent with the laws of Maine, the State in which Beckwith-Arden was incorporated, which provide:

"Sec. 104. Proxies ; general power of attorney.

"Shareholders may be represented by proxies granted not more than one year before the meeting, which shall be named therein ; they are not valid after a final adjournment thereof. * * *" (Me. Rev. Stats. Ann. tit. 13 (1964).)

he controlled in that capacity to be taken into account in determining the extent of his control over Beckwith-Arden—which is not at all clear, cf. *Old Colony Trust Co.* v. *United States*, 423 F. 2d 601 (C.A. 1, 1970) ; *Estate of Phyllis W. McGillicuddy*, 54 T.C. 315 (1970)—we think it apparent that he did not *retain* control of a majority of the stock. With respect to all but 37 percent of the stock which he voted, he had only proxy rights annually conferred on him by third parties; these were not "retained" rights. *White* v. *Poor, supra.*

Second, the trustees were free to sell the Beckwith-Arden stock. The right to control the dividend policy of a corporation can be a right to designate the income recipient of a trust holding its stock only if the corporation is of necessity a source of the trust income. Where a third-party trustee has unfettered power to dispose of the stock, then the donor retains no right to designate the income recipient of the trust; any influence which he may have over the disposition of the trust income depends on the will of a third party, i.e., a decision to retain the stock.

Paragraph Eleventh of the trust instrument, quoted in our Findings, gave the trustees power "in their sole discretion, to purchase or sell any securities or property * * * even to the extent of keeping the whole or any portion of the trust fund invested in the securities or shares of Beckwith-Arden, Inc." There is no evidence from which it may be inferred that this power was ever qualified in any way. Indeed, the successor trustee, appointed in 1958 after the original trustee died, testified that he never had any discussions whatever with the decedent concerning the disposition of the Beckwith-Arden stock or the manner in which it was to be voted. Thus, the trustee was given the unfettered power to sell the Beckwith-Arden stock and thereby terminate any influence which decedent may have had over who was to receive the trust income.

None of the so-called practical considerations cited by respondent nor all of them combined provide a basis for an inference that the decedent, by prearrangement or informal understanding or otherwise, reserved the right to cause the trustees to keep the Beckwith-Arden stock or to give him the proxies with respect thereto. Provisions in trust instruments giving one of several trustees sole authority to invest the trust corpus are not uncommon; this arrangement is used to provide for more attention to the investments by one of the trustees, thereby eliminating the expense of involving all of them. Nor do we think any inference of a retained right to control the trust can be drawn from evidence of the decedent's persuasive personality or his selection of individual trustees whose ability he had come to know from business associations with them. Cf. *Kramer* v. *United States*, 406 F. 2d 1363 (Ct. Cl. 1969). The record attests to the ability, business experience,

and competency of the individual trustees who were selected; it provides no basis for an inference that they were subservient to the decedent or otherwise faithless to their trust.

Nor does decedent's reserved right to remove the trustees and replace them with anyone other than himself provide a basis for an inference that he retained the right to control the corporation's dividend policy. Section 20.2036–1(b)(3), Estate Tax Regs., provides that "if the decedent reserved the unrestricted power to remove or discharge a trustee at any time *and appoint himself as trustee,* the decedent is considered as having the powers of the trustee." (Emphasis added.) Since the decedent here did not have the power to appoint himself as trustee, the power to administer the trust was always vested in third parties who were obligated to exercise their powers in the interest of all the beneficiaries. See *Old Colony Trust Co.* v. *United States, supra; Old Colony Trust Co.* v. *Silliman,* 352 Mass. 6, 223 N.E. 2d 504 (1967). Therefore, the decedent cannot be considered as having retained the trustees' powers. See *Estate of C. Dudley Wilson,* 13 T.C. 869 (1949), affirmed per curiam 187 F. 2d 145 (C.A. 3, 1951).

We hold that the decedent did not retain the right to designate the persons who would possess or enjoy the Beckwith-Arden stock or the income therefrom within the meaning of section 2036(a)(2).

Under section 2036(a)(1), the value of transferred property is includable in the decedent's gross estate, if the decedent "retained" for a period which did not in fact end before his death (1) "possession or enjoyment" of, or (2) the "right to the income" from, the property. The two tests are alternative. If by prearrangement a transferor receives the income from the transferred property until his death, the value of the property will be includable in his estate even though he has no enforceable right to such income. *McNichol's Estate* v. *Commissioner, supra.*

Respondent freely concedes that the decedent did not retain the right to the income from the Beckwith-Arden stock within the meaning of section 2036(a)(1), but contends that he enjoyed the power which the stock represented "just as surely as if the transfer in trust had never been made" in that he continued to vote the stock. But respondent errs in deemphasizing the statutory requirement that the enjoyment be "retained" by the transferor. See *Skinner's Estate* v. *United States, supra,* and the above discussion of section 2036(a)(2).

Although the decedent continued to vote the stock, he did not do so pursuant to an agreement or prearrangement. The provision in paragraph Twelfth of the trust instrument that the individual trustee "shall have sole authority to determine in what manner the trust property shall be invested and to vote or act in respect to all shares or securities held in trust" demonstrates that the decedent relinquished his legal right to vote the stock. There is no basis for holding

that this provision was a mere facade. As pointed out above, the successor trustee testified that he had no discussions whatever with the decedent as to who was to vote the stock. He further testified that he regarded the stock as a minority interest, "not particularly important from a voting standpoint," and that, consistent with the practice of many minority stockholders, he gave the decedent, president of the corporation, and Delwyn G. Main, its secretary, proxies to vote the stock at the annual meetings. Nothing prevented the trustee from declining to issue the proxies and personally voting the stock.

In the face of these facts, we do not think an informal agreement or prearrangement that the decedent would continue to vote the stock can be inferred from the fact that proxies were annually granted to him by the trustee. See, e.g., *Union Planters National Bank* v. *United States*, 361 F. 2d 662 (C.A. 6, 1966); *Estate of Binkley* v. *United States*, 358 F. 2d 639 (C.A. 3, 1966); *Guynn* v. *United States*, 309 F. Supp. 233 (W.D. Va. 1970); *Estate of Allen D. Gutchess*, 46 T.C. 554 (1966), acq. 1967–1 C.B. 2. Even if retention of the right to vote a fraction of the stock of a corporation can be said to be a retention of its possession or enjoyment, the evidence does not show that the decedent here retained any such right within the meaning of section 2036(a)(1).

*Decision will be entered under Rule 50.*